(131 P.3d 540)

No. 91,826

In the Matter of the Care and Treatment of ROBERT A. WARD.

Opinion filed
March 31, 2006.

*Bob L. Thomas* and *Megan L. Harrington*, of Thomas & Associates LLC, of Olathe, for appellant.

*Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, *W. Scott Toth*, special assistant attorney general, and *Phill Kline*, attorney general, for appellee.

Before ELLIOTT, P.J., JOHNSON and BUSER, JJ.

BUSER, J.: Robert A. Ward appeals the jury's verdict that he is a sexually violent predator as defined by the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 *et seq*. We reverse and remand for a new trial.

### *Factual and Procedural Background*

On April 27, 2002, Ward was charged in Johnson County District Court with three counts of criminal threat in violation of K.S.A. 21-3419. The complaint identified three dates, February 24, 2002, March 17, 2002, and April 12, 2002, on which Ward called three young girls, M.R., L.K., and K.D., and communicated "a threat to commit violence with the intent to terrorize another, or in reckless disregard of the risk of causing terror in another . . . ." Ward pled guilty to one count of criminal threat (a severity level 9 person felony) on August 23, 2002. In exchange for his guilty plea, the State dismissed the other two counts of criminal threat.

The district court sentenced Ward to the mid-point sentence of 6 months incarceration and, in accordance with the sentencing guidelines, placed him on presumptive probation for 12 months. At the time of sentencing, Ward had already served 166 days in custody. Among the conditions of probation, Ward was ordered to have no unsupervised contact with anyone under 18 years of age, undergo a mental health evaluation, and complete counseling.

After considering evidence presented at the sentencing hearing, the district judge stated, "I think the facts show beyond a reasonable doubt that one of the purposes for which the defendant com-

mitted the crime was the defendant's sexual gratification and therefore find that this was a sexually violent crime as defined in K.S.A. 22-4902(c)(14)." As a result, the district court ordered Ward to register as a sex offender.

Ward appealed from the registration order, and this court affirmed that ruling in *State v. Ward*, No. 89,659, unpublished opinion filed February 20, 2004. Rejecting Ward's challenge to the sufficiency of the evidence for purposes of sex offender registration, this court found "all of Ward's comments referenced the genitalia of pre-teenaged girls and Ward's body coming in contact with these girls. There is no way to interpret these statements other than as sexually violent overtures to young girls." Slip op. at 6. Ward did not petition the Kansas Supreme Court for review of this adverse decision.

Ward voluntarily surrendered his probation only 2 days after sentencing and returned to prison to serve the 12 days remaining on his sentence. On October 21, 2002, the day before Ward was scheduled for release from prison, the State filed a petition under the KSVPA. At the December 23, 2002, probable cause hearing held pursuant to K.S.A. 59-29a05, the district court found probable cause to retain Ward in custody for further evaluation. An amended petition was filed on February 7, 2003.

Ward filed two motions to dismiss on July 11, 2003. First, Ward contended the KSVPA was unconstitutional because it defined a "sexually violent predator" as a person who is "likely" to engage in repeat acts of sexual violence. See K.S.A. 59-29a02(a). Ward contended the use of the word "likely" in that definition "creates a burden of proof that is incompatible with the standard imposed by the Supreme Court of the United States and the higher standard Kansas itself requires . . . ." In his second motion to dismiss, Ward argued the State was without jurisdiction because it had not filed a special allegation of sexual motivation as provided by the KSVPA in K.S.A. 59-29a14(a). The district court denied both motions.

Trial commenced in July 2002, but a mistrial was declared when the jury was unable to reach a verdict. The retrial began on November 17, 2003.

Evidence at trial established that Ward had called three young girls on the telephone and, during the course of the conversations, had asked the girls vile and lascivious questions. These questions related to Ward describing deviant sex acts he could perpetrate upon the girls and the pain and injury those acts would cause to their vaginal and rectal areas. Ward told K.D. not to give the phone to her mother or hang up "because he knew where we lived, he knew our names, and he would come and hurt us . . . ." Ward also told L.K. he knew where she lived. Testimony further revealed that shortly before Ward made these calls, he had traveled to New York for penis enlargement surgery.

The State offered into evidence items seized from Ward's home, including numerous pictures of young girls dressed in swimming or gymnastics attire. In addition to the photographs, Ward possessed materials regarding area dance and gymnastics clubs and a program from a local gymnastics competition held April 13-14, 2002. Some of the victims were listed in this program.

Ward had attended the gymnastics competition on April 13, 2002, and videotaped several of the competitors. This occurred the day after Ward called K.D. who attended that competition. A representative selection of videotapes seized from Ward's home revealed he focused the camera almost exclusively on girls' pelvic areas. K.D.'s mother testified that her daughter no longer competes in gymnastics for fear of who might be watching her.

The State offered the journal entry of judgment from Ward's criminal case into evidence. The journal entry included the question "Was the crime sexually motivated?" The box for "Yes" was checked, and the journal entry was signed by the sentencing judge, prosecutor, and Ward's counsel.

The State presented the expert testimony of Rex Rosenberg, "a licensed master's level psychologist and licensed clinical psychotherapist at State Security Hospital at Larned." Rosenberg had conducted sexual predator evaluations since 1996. At the time of trial, he had been named the sexual predator evaluation coordinator for the Larned State Security Hospital.

Rosenberg testified that Ward's conviction for criminal threat was "determined to be sexually motivated." The State also used

Rosenberg's testimony to provide a detailed account of Ward's sexual history. Ward had told Rosenberg that he became curious about sex at age 5, began masturbating at age 7, and continued this practice nearly every day until he was incarcerated. Ward was 47 at the time of trial. Ward described his "gymnastics fetish" to Rosenberg, which first developed in his early teenage years when he furtively watched a gymnastics practice and clipped a photograph from a yearbook for masturbatory fantasies.

In the mid-1980's, Ward worked at a summer camp and started noticing younger teenage girls. Rosenberg recounted that Ward told him, " 'Once you start looking down, where does it end?' " and " 'You start with 16, then 14, and then, unfortunately, I started looking at younger ones in that way.' " Ward said he started noticing how "provocatively" 10- to 12-year-old girls were dressed in certain areas of New York, where he lived in the 1990's. Ward taught elementary school, and he told Rosenberg that when he saw some of his students, he "went 'oo-la-la.' "

Ward told Rosenberg that the pictures recovered from his house were used for masturbatory purposes. Ward described how, while living in New York, he would take pictures of females on public streets when he saw "something that stunned [him] that was so beautiful . . . ." The females ranged in age from about 11 to 40. Ward said he started using pictures out of magazines and catalogs because "the quality of the images and the quality of the models" were higher. Ward said that "eventually he would get rid of the collection that he had" because he was "disgusted with what he was doing." Ward always started a new collection, however, and he noted the collection seized by the police was his largest ever.

Ward admitted to videotaping at beaches and gymnastics meets. Ward told Rosenberg he intended to use the videotapes for masturbatory fantasies. Ward also said he had visited at least 100 gymnastics web sites and 30 ice skating web sites. Ward told Rosenberg the web sites "were being put together for the purposes of having males go into them looking for provocative pictures." Rosenberg testified Ward used pictures from the web sites "for sexual arousal and for masturbatory purposes."

Ward denied exclusive interest in children. Ward found younger females more exciting, however, because they were, in his words, "forbidden fruit." In his testimony at trial, Ward said his "whole sexual life is pretty damn dull whether it's fantasy or not." In contrast, Ward told Rosenberg that he found it "exciting to pretend that he was a bad guy" when calling the girls on the telephone. In addition to speaking with M.R., L.K., and K.D., Ward placed approximately 20 other telephone calls, although not all of them resulted in obscene language.

Rosenberg commented on a Kansas City radio station's recorded telephone calls and interview with Ward while he was in jail. Rosenberg thought the interview showed Ward's lack of insight into the impact his actions had on the victims, and how, in Ward's opinion, "he's being victimized by the DA and the judge and the prison evaluator . . . ."

Among other mental disorders, Rosenberg diagnosed Ward with pedophilia. According to Rosenberg, this disorder made it seriously difficult for Ward to control his behavior. Rosenberg also expressed concern that Ward was beginning to express his fantasies directly, and he believed this escalation would continue. In Rosenberg's opinion, Ward's pedophilia was a mental abnormality that made him likely to engage in repeat acts of sexual violence.

Ward testified in the State's case in chief. He readily admitted to sexual fantasies about prepubescent children, to masturbating while having such fantasies, to the use of photographs and videotapes for this purpose, and to making the videotapes and phone calls to young girls. Ward maintained he had never actually touched a child, however, and that when he fantasized about having intercourse with a child, he pictured himself as a young teenage male he called "Brian Paul." Ward also denied telling Rosenberg that he had an increased attraction to younger children.

Ward generally denied that he suffered from pedophilia. When asked if he needed treatment, Ward responded, " 'Spirituality or treatment, . . . one, the other, or both.' " Ward offered no specifics, however, and maintained "I'm not going to spend my life in a mental asylum."

Ward presented testimony from two doctorate level psychologists. The first, Robert W. Barrett, a clinical psychologist, was previously the chief psychologist at the Kansas State Department of Corrections Reception and Diagnostic Center, where he performed psychological evaluations of prisoners. At the time of trial he worked as a board certified forensic examiner, providing psychological screening for various organizations.

Barrett disagreed with Rosenberg's diagnosis of pedophilia, finding instead that Ward had "what's sort of informally called [a] fetish. He's interested in the clothing, provocative clothing on a wide range of women, and it's not children per se that are of particular interest to him." Dr. Barrett's diagnosis was paraphilia, specifically "[i]n this case [Ward] seems to be most interested in the buttocks of women encased in spandex." Dr. Barrett thought it especially significant Ward possessed no child pornography, stating in his experience that this was an almost invariable interest of pedophiles. Dr. Barrett also thought Ward's motivation for the phone calls was not sexual arousal because he had placed them from a public phone, which was contrary to the typical behavior of persons making scatological phone calls.

The second defense expert, clinical psychologist William L. Albott, had worked as a staff psychologist on the general psychiatric unit and a unit for the criminally insane at Larned State Hospital and at Osawatomie State Hospital treating adolescents. He had served on the faculty of the Menninger School of Psychiatry and was formerly president of the Kansas Psychological Association. Dr. Albott collaborated with others to formulate the sex offender treatment program currently in use at the Larned State Hospital.

Dr. Albott's testimony focused on the methodology used by Rosenberg. Dr. Albott thought Rosenberg's descriptions of Ward's sexual fantasies had little to do with the triggers which might explain why Ward committed the criminal threats. Dr. Albott characterized some of Rosenberg's testing as invalid, and he found it "puzzling at best and distressing" that Rosenberg drew conclusions from that testing. Dr. Albott claimed Rosenberg's evaluation of Ward's potential to reoffend did not meet American Psychological Association guidelines. Dr. Albott rescored Ward's results from

Rosenberg's testing and stated that Ward had "a 10 percent likelihood of reconviction over a 16-year period, not a 36 percent chance" as Rosenberg had determined. Dr. Albott also disagreed with the diagnosis of pedophilia, agreeing instead with the diagnosis offered by Dr. Barnett.

The State presented rebuttal testimony from Gerald H. Vandenberg, a licensed doctorate level psychologist. Dr. Vandenberg, after reviewing Ward's files and listening to some of the Dr. Barnett's testimony, testified that Ward's behavior was "consistent with the diagnosis of pedophilia. I don't want to take the one step farther and say that Mr. Ward is a pedophile, because I haven't examined him . . . ." Dr. Vandenberg disagreed with Dr. Barnett's diagnosis that Ward's condition was limited to paraphilia, stating "this [Ward's behavior] in my opinion goes beyond that." Dr. Vandenberg testified that Ward's telephone calls had "[p]retty ugly sexual content," and that possession of child pornography is not critical to a pedophilia diagnosis.

During closing argument, the State's attorney made numerous comments which are discussed in detail below. He concluded his argument by telling the jury:

"You know, I told you at the beginning of this case that if you've got a reasonable doubt, if you've got a reasonable doubt, you're not going to get on that airplane. And if you go to the airport and you find out that the pilot's got a history of substance abuse, maybe been busted for operating or piloting the plane while under the influence of alcohol or drugs, and you find out that that pilot's never been treated and he's ready to hop back up on that airplane, are you going to put your kids on that airplane? Well, I'm telling you, ladies and gentlemen, Robert Ward's piloting that ship. So you make the decision."

After the jury had been excused for deliberations, Ward's counsel moved for a mistrial due to the State's closing argument. The district court denied the motion. Ward also filed a motion for judgment notwithstanding the verdict based on the State's closing argument which was also denied.

On November 20, 2003, the jury returned its verdict finding beyond a reasonable doubt that Ward was a sexually violent predator. Ward filed a timely appeal.

### *Due Process Implications of the Definition*
### *"Sexually Violent Predator"*

Ward first contends the KSVPA is unconstitutional because K.S.A. 59-29a02(a) defines "[s]exually violent predator" as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence." According to Ward, "[t]he use of the word 'likely' in the [K]SVPA's definition of a sexually violent predator creates a lesser burden of proof which is incompatible with [the] standard imposed by the Supreme Court and the higher standard Kansas itself requires in the [K]SVPA."

An appellate court's review of statutory interpretation is unlimited. *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004). We begin our review, however, "by remembering our longstanding and well-established rules that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and that before a statute may be struck down, it must clearly appear that the statute violates the Constitution. [Citation omitted.]" *In re Care & Treatment of Hay*, 263 Kan. 822, 831, 953 P.2d 666 (1998).

Due process in civil commitment cases requires a higher standard of proof than preponderance of the evidence. *Addington v. Texas*, 441 U.S. 418, 431, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979). The KSVPA provides the requisite burden of proof for civil commitment is beyond a reasonable doubt. K.S.A. 59-29a07(a) and (e). As a result, Ward concedes the KSVPA requires "a more stringent standard of proof" than mandated by the Constitution.

Ward's complaint, however, is that "the use of the word 'likely' in the [K]SVPA's definition of a sexually violent predator is akin to a preponderance of the evidence standard of proof which has been found by the Supreme Court to be unconstitutional in civil commitment hearings." Ward provides no statutory or case law precedent in support of his novel claim.

"In construing statutes and determining legislative intent, several provisions of an act or acts, *in pari materia,* must be construed together with a view of reconciling and bringing them into a work-

able harmony if possible." *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, Syl. ¶ 2, 69 P.3d 1087 (2003).

With regard to the challenged statutory language, Ward's argument fails to consider the KSVPA as a whole. As noted by the State, the KSVPA definition of "likely to engage in repeat acts of sexual violence" means "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." K.S.A. 59-29a02(c). As noted earlier, the ultimate question, whether a defendant is a sexually violent predator, must be proven beyond a reasonable doubt. K.S.A. 59-29a07(a) and (e). Considering these statutory provisions together, the KSVPA requires the court or jury to determine beyond a reasonable doubt that, *inter alia*, the person poses a menace to the health and safety of others.

Requiring a more exacting definition would mandate a level of certainty beyond that necessary for due process. See *Kansas v. Crane*, 534 U.S. 407, 411, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002) ("requiring the State *always* to prove that a dangerous individual is *completely* unable to control his behavior . . . is far too rigid."); *Addington*, 441 U.S. at 430 ("Nor should the state be required to employ a standard of proof that may completely undercut its efforts to further the legitimate interests of both the state and the patient that are served by civil commitments.").

In *Addington*, the United States Supreme Court suggested that employing a burden of proof similar to the one required under Kansas law may be *too* demanding as a matter of psychiatry, if not constitutional law: "Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. [Citations omitted.]" 441 U.S. at 429. Not only did the Supreme Court use the very word "likely," which Ward protests here, it was used to express the Court's opinion that this standard was in all practicality too rigorous. Because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations," states are not required under the Fourteenth Amendment to employ the reasonable doubt standard, although they are free to do so. 441

U.S. at 430-31. *Addington* teaches that the burden of proof standard employed in the KSVPA and the statutory language "likely to engage in repeat acts of sexual violence" in K.S.A. 59-29a02(a), not only meets but exceeds the Constitution's due process requirements in civil commitment cases.

Finally, the United States Supreme Court has specifically considered and approved the due process implications of the KSVPA provisions in two cases. See *Crane*, 534 U.S. 407; *Kansas v. Hendricks*, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997).

In *Hendricks*, the United States Supreme Court held that the KSVPA's definition of "mental abnormality" satisfied due process requirements for civil commitments. *Hendricks*, 521 U.S. at 371. As part of the Court's holding, the majority referenced language similar to that challenged here ("likely to engage in the predatory acts of sexual violence") as used in the predecessor statute, K.S.A. 59-29a02(a) (Furse 1994). The Court concluded that "[t]he statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." *Hendricks*, 521 U.S. at 357-58. The Court held: "The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." *Hendricks*, 521 U.S. at 358.

Similarly, in *Crane*, the United States Supreme Court noted: "In *Hendricks*, this Court upheld the Kansas Sexually Violent Predator Act, Kan. Stat. Ann. § 59-29a01 *et seq.* (1994), against constitutional challenge. . . . And it held that the statutory criterion for confinement embodied in the statute's words 'mental abnormality or personality disorder' satisfied ' "substantive" due process requirements.' [Citation omitted.]" *Crane*, 534 U.S. at 409.

We hold that the use of the word "likely" in the KSVPA's definition of a sexually violent predator (K.S.A. 59-29a02[a]) does not establish a lesser burden of proof in civil commitment cases than

is required under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Failure to File Special Allegation of Sexual Motivation*

Ward claims error because the State failed to file a special allegation of sexual motivation in his criminal case pursuant to K.S.A. 59-29a14. Ward contends K.S.A. 59-29a14 is "a statutory duty placed on the State" because "[a] criminal defendant has no way of knowing whether the State believes its evidence will lead to a sex predator commitment proceeding." Once again, this issue involves statutory interpretation, and this court's review is unlimited. See *Cooper*, 277 Kan. at 252.

K.S.A. 59-29a14 provides in part:

"(a) The county or district attorney shall file a special allegation of sexual motivation within 10 days after arraignment in every criminal case other than sex offenses as defined in article 35 of chapter 21 of the Kansas Statutes Annotated . . . when sufficient admissible evidence exists, which, when considered with the most plausible, reasonably foreseeable defense that could be raised under the evidence, would justify a finding of sexual motivation by a reasonable and objective fact finder.

"(b) In a criminal case wherein there has been a special allegation, the state shall prove beyond a reasonable doubt that the accused committed the crime with a sexual motivation. The court shall make a finding of fact of whether or not a sexual motivation was present at the time of the commission of the crime, or if a jury is had, the jury, if it finds the defendant guilty, also shall find a special verdict as to whether or not the defendant committed the crime with a sexual motivation."

We begin by noting the hybrid character of this statute. Although located in the probate code, the statute directs when a special allegation of sexual motivation is to be filed in a criminal case. Any finding based upon such an allegation is not used in the criminal case, however, but in the KSVPA proceeding. This distinguishes K.S.A. 59-29a14 from a finding of sexual motivation for purposes of sex offender registration under K.S.A. 2005 Supp. 22-4902(c)(14).

A finding of sexual motivation under K.S.A. 59-29a14(b) means that, in addition to the sex crimes listed at K.S.A. 59-29a02(e)(1)-(12), a crime so motivated is a "sexually violent offense" under the KSVPA. K.S.A. 59-29a02(d) and (e)(13). Importantly, subsection

(e)(13) provides that a finding of sexual motivation may be made *either* at sentencing in an underlying criminal case *or* during the KSVPA proceeding. K.S.A. 59-29a02(e)(13). These alternative approaches provide the key to interpreting K.S.A. 59-29a14. See *Oshman*, 275 Kan. 763, Syl. ¶ 2 (the provisions of an act should be construed together in pari materia).

Here, the State did not file a special allegation of sexual motivation within 10 days following Ward's arraignment in the criminal case. Instead, during the KSVPA civil commitment proceeding, the State alleged and the jury determined that Ward's offense was sexually motivated. Given that the KSVPA provides alternative methods for the State to allege and prove sexually motivated offenses, a question arises whether the State was still obliged to file a special allegation in Ward's criminal case.

This issue, however, is not properly before us because Ward has not made a sufficient showing that within 10 days from Ward's arraignment *sufficient admissible evidence* existed which, *when considered with the most plausible, reasonably foreseeable defense under the evidence,* could lead a *reasonable and objective factfinder* to a finding of sexual motivation. See K.S.A. 59-29a14(a).

Ward argues that "sufficient evidence to justify a finding of sexual motivation . . . exist[ed] . . . . The affidavit which accompanied the . . . criminal complaint provided enough information to justify such a finding." There are three reasons, however, why appellate review is not appropriate in this circumstance.

First, the district court did not make findings regarding the state of the evidence, Ward's most plausible, reasonably foreseeable defense, or whether a reasonable and objective factfinder could have found sexual motivation. We are precluded from making such a determination. See *Oshman*, 275 Kan. at 775 (an appellate court does not weigh the evidence). Second, the State's position at the hearing on this issue was that the applicability of the KSVPA was *not* obvious at the beginning of the criminal case, and Ward presented no evidence to the contrary. Third, although this court has already held "[t]here is no way to interpret [Ward's] statements other than as sexually violent overtures to young girls," *Ward*, slip op. at 6, on appeal Ward does not address the statutory require-

ment to consider this evidence against the most plausible, reasonably foreseeable defense that could be raised. See K.S.A. 59-29a14(a). Even if we were to attempt this analysis, the record contains too little information regarding the criminal case to indicate what, if any, defenses were plausible and reasonably foreseeable at the time a special allegation of sexual motivation was to be filed.

In summary, we are unable to reconstruct the situation which existed within 10 days after arraignment in Ward's criminal case. It was Ward's duty to designate a record "sufficient to establish the claimed error." *State ex rel. Stovall v. Alivio*, 275 Kan. 169, 172, 61 P.3d 687 (2003). Given the record before us, Ward's claim that the State was required to file a special allegation of sexual motivation in the criminal case does not establish error.

### Admission of Prior Judicial Determination that Crime Was Sexually Motivated

Ward contends "[t]he trial court erred when it admitted [during the KSVPA proceeding] a prior judge's finding that [Ward's] underlying conviction for criminal threat was sexually motivated." In particular, Ward complains the district court abused its discretion by the admission of this evidence because "[n]o reasonable person would have agreed that a court's finding of sexual motivation at sentencing, when made solely for the purpose of [Ward's] registration as a sex offender, should have been admissible to prove [Ward] was a sexually violent predator."

The pretrial judicial determination that Ward's criminal threat conviction was sexually motivated was admitted in evidence during the KSVPA proceeding in two ways. First, the State offered the journal entry of judgment which, among other information, contained the question "Was the crime sexually motivated?" A check mark was entered in the box which indicated "Yes." Second, during the KSVPA trial, psychologist Rex Rosenberg testified that Ward was convicted of a criminal threat which was "determined to be sexually motivated."

Our standard of review regarding the admission of evidence, subject to exclusionary rules, is abuse of discretion. "A court may

only be said to have abused its discretion when its actions are arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the view of the trial court." *In re Care & Treatment of Hay*, 263 Kan. 822, 836, 953 P.2d 666 (1998).

At the outset, Ward's claim is not properly before this court because Ward's counsel failed on both occasions to object to the admission of this evidence. See *State v. Kunellis*, 276 Kan. 461, 477, 78 P.3d 776 (2003).

When the State offered the journal entry, Ward's counsel approached the bench and told the district court, "I don't have an objection to the journal entry." Ward's counsel stated further, "I just wanted it noted for the record that our contention is that sexual motivation for purposes of registering, not for purposes of the offender statute, the predator statute [*sic*]." On appeal, Ward acknowledges he did not object to the journal entry. Instead, he claims he objected to "the use of that court's finding of sexual motivation at the predator trial."

It is difficult to discern how Ward objected to the use of the finding of sexual motivation without objecting to the admission of the document which memorialized that finding. The failure of Ward's counsel to object to the admission of the journal entry or Rosenberg's testimony bars appellate review of this evidentiary issue.

### Sufficiency of Evidence

Ward contends the evidence at trial was insufficient to support the verdict. The appellate standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, a reasonable factfinder could find the defendant to be a sexually violent predator beyond a reasonable doubt. *In re Care & Treatment of Hay*, 263 Kan. at 842.

Ward first complains that he did not commit a sexually violent offense because the crime was "never proven to be sexually motivated beyond a reasonable doubt at the civil commitment trial."

Evidence presented at trial established that Ward's phone calls to three young girls contained vile and lascivious questions about Ward engaging in deviant sex acts that would cause pain or injury

to the girls' vaginal and rectal areas. Ward's numerous pictures of young girls dressed in swimming or gymnastics attire and videotapes focused almost exclusively on young girls' pelvic areas underscored the sexual nature of these phone calls. Ward also admitted to the dullness of his long-time autoeroticism, which contrasted with his description of the excitement he felt upon actually contacting the girls by telephone. As noted earlier, this court has already held "[t]here is no way to interpret [Ward's] statements other than as sexually violent overtures to young girls." *Ward*, slip op. at 6. Finally, even Ward concedes on appeal that psychologist Rex Rosenberg "did testify that he believed the phone calls were sexually motivated." In summary, there was considerable evidence to establish that Ward's conviction for criminal threat was sexually motivated.

Ward next contends the evidence was insufficient to establish that he suffers from a mental abnormality or personality disorder which makes him likely to engage in repeat acts of sexual violence or experience serious difficulty in controlling his behavior.

Our review of the record reveals that Rosenberg diagnosed Ward with pedophilia—a mental disorder which made it seriously difficult for Ward to control his behavior. Rosenberg also opined this diagnosis made Ward likely to engage in repeat acts of sexual violence. Ward acknowledges this testimony but suggests Rosenberg's opinion was not convincing, especially when compared to the opinions of his defense experts. Ward is essentially asking us to reweigh the evidence or determine witness credibility, but both assessments are beyond the purview of this court. See *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000).

Apart from Rosenberg's expert opinion, evidence showed that Ward resisted therapeutic efforts to help control his behavior. For example, Ward refused to participate in therapy ordered as part of his probation, characterizing it as a plot by the State. Considered together, there was sufficient evidence to establish that Ward suffered from a mental abnormality or personality disorder which made him likely to engage in repeat acts of violence or serious difficulty in controlling his behavior.

Finally, Ward argues his actions were not as egregious as some reported in our published cases. While that may be true, by enacting the KSVPA "the Kansas Legislature has taken great care to confine only a narrow class of particularly dangerous individuals . . . ." *Kansas v. Hendricks*, 521 U.S. 346, 364, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997). In deciding whether Ward fit the definitions established by the legislature, the jury properly did not consider the wide range of predatory acts described in published case reports. The State was not required to prove that Ward was one of the worst sexually violent predators in Kansas, only that his mental condition and conduct met the KSVPA's definition of a sexually violent predator in K.S.A. 59-29a02(a).

Having considered each argument raised by Ward, we hold that a reasonable factfinder, considering the evidence at trial in the light most favorable to the State, could have found Ward was a sexual predator beyond a reasonable doubt.

### State's Closing Argument

Ward's final claim of error relates to the State's closing argument. The State's attorney began his closing argument by stating, "Those are Robert Ward's words, ladies and gentlemen: 'There are no guarantees.' But when you are risking the safety of children, you need a guarantee. . . . And you know the stakes are high." From these opening words the State's attorney developed his theme—that unless the jury found that Ward was a sexual predator, they were putting at risk the safety of their children and the community's children.

Early in the closing argument, the State's attorney posed two rhetorical questions:

"And here's the question: Should the parents of children be worried? Do you find that Robert Ward is a guy who's just into making obscene phone calls or a man who has a much darker, violent and aggressive side to him; a man who, if released today by you, poses a risk to the lives and the safety of our children? He is the latter, not the former."

Later in the argument, the State's attorney warned:

"His behavior is escalating, and it should concern you.
. . . .

"You know, with all due respect to the psychologist that testified on behalf of Mr. Ward today, does just the evidence, the phone calls, the videotapes, the statement of the police suggest anything other than a ticking time bomb? Absolutely not. Should the parents of girls be worried? Absolutely.

" . . . And you can feel sorry for Robert Ward, but he needs to get the help that he needs for the protection of our children.

. . . .

". . . He's the way that he is. And if he's this way, he's a risk to children."

Throughout his closing argument, the State's attorney returned to the opening theme that "parents of children" and "parents of girls," should be "concerned," or "worried" about the risk Ward posed "to the lives and the safety of our children." The State's attorney cautioned that Ward "was likely to do it again unless you intervene." With regard to Dr. Barnett's expert opinion that Ward did not pose such a threat, the State's attorney stated, "I'm here to tell you that if you were to—if Dr. Barnett was paid to say 2 plus 2 equals 5, he would do it . . . ."

It was in this context that the State's attorney concluded his argument with an allegory:

"You know, I told you at the beginning of this case that if you've got a reasonable doubt, if you've got a reasonable doubt, you're not going to get on that airplane. And if you go to the airport and you find out that the pilot's got a history of substance abuse, maybe been busted for operating or piloting the plane while under the influence of alcohol or drugs, and you find out that that pilot's never been treated and he's ready to hop back up on that airplane, are you going to put your kids on that airplane? Well, I'm telling you, ladies and gentlemen, Robert Ward's piloting that ship. So you make the decision."

In his motion for a mistrial after the jury had been excused for deliberations, Ward's counsel protested that the "State's . . . final closing comment was to place the jury in the position of their children being exposed to Robert Ward." The district court judge denied the motion, acknowledging "it's maybe not the best choice of phrase for the closing," but stating, "[T]he way I took the comments and the way I think the jury undoubtedly took the comments was in the collective view, referring to society." The district court further explained its ruling as follows:

"[T]his case does not simply involve the jurors making a determination as to whether there's a mental disease or defect, whether there's a likelihood the of-

fender is going to find it impossible or substantially difficult to reoffend. That's the heart of the case, those two issues. He's [the State's attorney] allowed latitude in arguing the second half of that. He need not confine himself to the clinical medical issues in the case where there are two issues."

Ward also filed a posttrial motion based on the State's closing argument. This motion was denied as well.

On appeal, Ward initially invites us to apply the prosecutorial misconduct standard used in criminal cases to this civil commitment proceeding because while "the SVPA is civil in nature, it contains many similarities to a criminal trial." Ward argues the State's comments during closing argument were improper because they were "comments on the credibility of a witness and appeals to community values."

The State counters that Ward seeks to impermissibly "graft the body of criminal cases discussing prosecutorial misconduct in closing argument onto sexual predator cases." The State also emphasizes that the closing argument by the State's attorney addressed a key issue at trial: "Whether there was a likelihood the offender was going to find it impossible or substantially difficult to reoffend." Finally, the State submits that the substance of the arguments was "about the community as a whole rather than the community of jurors."

This court has used the prosecutorial misconduct standard as a means to evaluate the propriety of a State's attorney's opening statement in a KSVPA proceeding. See *In re Care & Treatment of Foster*, 33 Kan. App. 2d 717, 724, 107 P.3d 1249 (2005), *rev'd* 280 Kan. 845, 127 P.3d 277 (2006). In its recent opinion reversing this court's *Foster* decision, however, the Kansas Supreme Court declined to apply the prosecutorial misconduct standard. 280 Kan. at 853 (characterizing it as "our stair-step analysis articulated in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 [2004]").

Instead of adopting the *Tosh* analysis for use in KSVPA proceedings, the Supreme Court focused on whether the "attorney misconduct" alleged by Foster was "inconsistent with substantial justice and affects his substantial rights, see K.S.A. 60-261, and denies him his right to a fair trial." *In re Care & Treatment of Foster*, 280 Kan. at 861. The Supreme Court reached its conclusion

"after considering the admittedly strong evidence against Foster." 280 Kan. at 861. Significantly, our Supreme Court cited both criminal and civil cases in its analysis. See 280 Kan. at 854-60.

One case highlighted by our Supreme Court in *Foster* was *Smith v. Blakey, Administrator*, 213 Kan. 91, 515 P.2d 1062 (1973). The Supreme Court noted that in *Blakey*, "even though defense counsel had not objected, this court reversed and remanded for a new jury trial . . . because of the opposing counsel's conduct, including improper statements in closing argument." *In re Care & Treatment of Foster*, 280 Kan. at 854. In the *Blakey* opinion itself, our Supreme Court had stated both the general rule regarding contemporaneous objections in civil cases and the exception when the fairness of the trial is in question:

> "We are cognizant of the rule that on appeal reversible error will not be considered when based on misconduct of counsel unless objection is made in trial court. [Citations omitted.] We adhere to this rule; however, we point out that in the above cited cases the instances of impropriety were isolated and not of the nature disclosed by this record. . . . . [Here, counsel's] efforts were not of an isolated nature but, to the contrary, permeated the whole of the trial from opening statement to final argument. . . .
>
> "Under what circumstances do remarks of counsel result in reversible error? An uncontradictable answer must be: they are reversible error when, because of them, the parties have not had a fair trial." 213 Kan. at 95-96.

In the instant case, the State contends Ward's objection after the jury retired preserved for review only the final airplane allegory. Considering *Foster* and *Blakey*, however, we believe the entirety of the State's closing argument is subject to review because of the substantial constitutional rights involved.

We also note that in reviewing the KSVPA, the United States Supreme Court emphasized civil involuntary commitment is permissible only if "the confinement takes place pursuant to proper procedures and evidentiary standards." *Hendricks*, 521 U.S. at 357. This is because the liberty interest in freedom from physical restraint " 'has always been at the core of the liberty protected by the Due Process Clause . . . .' " 521 U.S. at 356 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80, 118 L. Ed. 2d 437, 112 S. Ct. 1780 [1992]). Moreover, if "the typical civil case involving a monetary

dispute between private parties," where "society has a minimal concern with the outcome," is reversible absent a fair trial, so much more should an appellate court consider allegations of abusive argumentation where a party has been civilly committed, which is "a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 423, 425, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979).

In conducting this review, we keep in mind the fundamental duty of counsel in closing arguments—to argue the evidence. See *Hudson v. City of Shawnee*, 246 Kan. 395, Syl. ¶ 16, 790 P.2d 933 (1990). The mandate to argue the evidence and not appeal to passion or prejudice has a long history in Kansas. In *State v. Laird*, 79 Kan. 681, Syl. ¶ 3, 100 Pac. 637 (1909), the district court properly excluded argument on facts "immaterial and evidently intended to excite the sympathy of the jury . . . ." In *Forsyth v. Church*, 141 Kan. 687, Syl. ¶ 3, 42 P.2d 975 (1935), the Supreme Court condemned "inflammatory argument of counsel reciting testimony not introduced in evidence, ridiculing witnesses, and making appeals to passion and prejudice . . . ." In *State v. Majors*, 182 Kan. 644, 648, 323 P.2d 917 (1958), the Supreme Court taught that "appeals to the self-interests of jurors . . . . are not to be condoned because they are obviously prejudicial to the defendant's right to a fair trial." In *State v. Kelley*, 209 Kan. 699, Syl. ¶ 4, 498 P.2d 87 (1972), the Supreme Court stated that prosecutors "should not use statements calculated to inflame the passions or prejudices of the jury," and "should refrain from argument which would divert the jury from its duty to decide the case on the evidence . . . ." Finally, in *State v. McHenry*, 276 Kan. 513, 523, 78 P.3d 403 (2003), the Kansas Supreme Court examined whether a prosecutor used a "golden rule" argument, which the Supreme Court defined as "the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members." The Supreme Court explained such arguments were improper because "they encourage the jury to depart from neutrality and to decide the case on the improper basis of personal interest and bias." 276 Kan. at 523.

In summary, there exists in Kansas civil and criminal jurisprudence a long history wherein our Supreme Court has admonished trial counsel to argue the evidence and avoid rhetoric designed to inflame the passions and prejudices of the jury, thereby diverting the jury from its duty to fairly and impartially evaluate the evidence.

Examining the State's closing argument in the instant case, we first consider whether the State's attorney exceeded the bounds of the evidence when he asserted Ward's expert would testify to patent falsehoods for money. The expert, Robert Barnett, a Ph.D. level psychologist, was previously the chief psychologist at the State Reception and Diagnostic Center. He had evaluated pedophiles before and had testified numerous times as an expert. Our review of the record reveals no scintilla of evidence to suggest that Dr. Barnett would commit perjury because he was paid an expert witness fee to testify for the defense. These comments were impermissible because they were without any evidentiary foundation. We also note, in mitigation, that the comment was brief, was stated only once, and the jury was aware that both parties had produced expert witnesses in support of the parties' respective legal positions.

We have grave concerns, however, about the repeated references to the risk Ward posed, if not confined, to the jurors' children ("our children") and the community's children and the culmination of this argument in the airplane allegory. These comments were well beyond the wide latitude allowed in discussing trial evidence. See *Hudson*, 246 Kan. 395, Syl. ¶ 16. The State's allegory was not based upon facts developed during trial and did not address the important issues to be decided on the verdict form—whether Ward had been convicted of a criminal threat, whether the crime was sexually motivated, and whether Ward suffered from a mental abnormality or personality disorder which made him likely to engage in repeat acts of sexual violence.

We understand this allegory to mean the State's attorney was encouraging jurors to decide this case as parents with fears for their own children's safety. Significantly, this argument directly contradicted the district court's instruction to the jury: "You must not be influenced by anything not within the issues of the case." We view this argument as especially provocative because it not only ex-

ploited the fears of parents, but it effectively dissuaded the jurors from evaluating the merits of the case fairly, impartially, and dispassionately.

As already noted, the State defends the propriety of the allegory by contending the oratorical device was simply argument to persuade the jury that Ward was likely to reoffend—an element essential to the State's burden of proof. While we agree the State was permitted to argue that Ward's mental condition created a likelihood of future sexually motivated violent acts, the crux of the allegory did not address the direct and circumstantial trial evidence in support of this essential issue. Rather, the allegory was an impassioned plea for jurors to decide this case as parents personally fearful for the safety of their own children. As enacted by the legislature, the KSVPA "requires *evidence* of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." (Emphasis added.) *Hendricks*, 521 U.S. at 357-58. The personal fears of parents who are jurors in KSVPA cases are not evidence and, as a result, should not be the subject of argument by counsel. See *State v. Duke*, 256 Kan. 703, 719, 887 P.2d 110 (1994) (Prosecutors "should not use statements calculated to inflame the passions or prejudices of the jury . . . or . . . mak[e] predictions of the consequences of the jury's verdict.").

We also disagree with the district court's view that because the State's attorney referenced children "in the collective view, referring to society" that the argument was permissible. Whether the argument appealed to the jurors' personal fears for the safety of the community's children or their own children, we consider this argument highly improper. In *State v. Jordan*, 250 Kan. 180, 193, 825 P.2d 157 (1992), a prosecutor told the jury, " '[I]t's up to you now . . . if you want to live in a community where a person can kill another person . . . and excuse it because he had a few drinks, that's up to you.' " The Kansas Supreme Court held the "argument was improper . . . in appealing to a juror's personal interests as a member of a community." See also *State v. Finley*, 268 Kan. 557, 572, 998 P.2d 95 (2000) ("We cannot tolerate this kind of drug use in our community, especially when a person dies. You have to find

him guilty."); *State v. Green,* 254 Kan. 669, 684, 867 P.2d 366 (1994) ("What you [the jurors] decide will be what our community stands for.").

Having carefully examined the State's entire closing argument, we also must conclude it was obviously planned with an impermissible theme running throughout, culminating in the airplane allegory. This allegory was not a careless phrase or unfortunate slip of the tongue. Instead, it was specifically designed to play upon a powerful motivator—the jurors' fears as parents and as guardians of the community's children. The allegory ultimately referenced the jurors' own children and was preceded by repeatedly provocative references, effectively encouraging the jury to forsake its sworn duty to reach a verdict through fair, impartial, and dispassionate deliberation.

Turning to the strength of the evidence, we have already noted that the Supreme Court found reversible error in *In re Care & Treatment of Foster* even though the evidence was "admittedly strong . . . against Foster." 280 Kan. at 861. In this case, the evidence was controverted, convincing us that the error requires reversal. Stated another way, we cannot find the misconduct by the State's attorney was harmless. See *Chapman v. California,* 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967).

Ward's first trial resulted in a mistrial due to a hung jury. In this retrial, the expert psychological testimony presented by the State regarding the nature and significance of Ward's mental abnormality or personality disorder was directly challenged by Ward's two expert psychologists. Similarly, the critical issue of whether Ward's mental abnormality or personality disorder made it difficult if not impossible to control his dangerous behavior was also disputed.

Given our complete review of the record, we hold that the district court's failure to grant a mistrial was an abuse of discretion because the attorney misconduct was inconsistent with substantial justice, affected Ward's substantial rights and denied him his right

to a fair trial. See K.S.A. 60-261; *In re Care & Treatment of Foster*, 280 Kan. at 861.

We reverse the jury's verdict and remand for a new trial.