NOT DESIGNATED FOR PUBLICATION

No. 116,707

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Care and Treatment of

HERBERT DOWNEY.

MEMORANDUM OPINION

Appeal from Reno District Court; PATRICIA MACKE DICK, judge. Opinion filed July 21, 2017. Affirmed.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MCANANY and ATCHESON, JJ.

*Per Curiam*: Claiming insufficient trial evidence, Herbert Downey appeals his involuntary commitment as a sexually violent predator. While we cannot legally reweigh the evidence, our review of the record compels us to hold that the State proved beyond a reasonable doubt that Downey is a sexually violent predator, subject to involuntary commitment.

To classify a person as a sexually violent predator under the Sexually Violent Predator Act, the State must prove four elements:

- the individual has been convicted or charged with a sexually violent offense;
- the individual suffers from a mental abnormality or personality disorder;

1

- the individual is likely to commit repeat acts of sexual violence because of a mental abnormality or personality disorder, and
- the individual has serious difficulty controlling his or her dangerous behavior. See K.S.A. 2016 Supp. 59-29a02(a); *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011).

Proof must be beyond a reasonable doubt. See K.S.A. 2016 Supp. 59-29a07(a).

Downey does not challenge the first two elements of the statutory requirements. Instead, he challenges whether there was sufficient evidence to show that he is likely to commit repeat acts of sexual violence due to his mental abnormality, and whether it was shown that he has serious difficulty controlling his dangerous behavior.

In our review of the record, we will first give some general background information to provide a context and then proceed in greater detail when we consider the two elements Downey contests.

We look first at his criminal case. Based upon fact stipulations, the trial court found Downey guilty of rape and sodomy of a 2-year-old girl. See *State v. Downey*, 27 Kan. App. 2d 350, 351-57, 2 P.3d 191 (2000). The court imposed a long prison sentence. Prior to his Kansas crimes, Downey was convicted of sexual abuse in New York after rubbing his 5-year-old niece's hand on his penis. Toward the end of his prison sentence, the State sought Downey's commitment as a sexually violent predator. That commitment is the subject of this appeal.

Without going into great detail, we note that this commitment case has been through several levels of litigation and now returns to us after a panel of this court remanded Downey's commitment for a new trial. See *In re Care & Treatment of Downey*, No. 110,474, 2015 WL 249704, at *8 (Kan. App. 2015) (unpublished opinion), *rev.*

2

*denied* 301 Kan. 1046 (2015). Back once again at the district court at a new bench trial, Downey and three experts gave testimony: Dr. Stephanie Adam, Dr. Jane Kohrs, and Dr. Jarrod Steffan. We will review their testimony in that order.

*We summarize Downey's testimony.*

Downey denied raping and sodomizing the 2-year-old; however, he acknowledged that he was convicted in Kansas of that crime.

In a prior statement to the police, Downey stated that the 2-year-old had seen him masturbating and he let her stroke his penis one or two times. Downey's statement also noted that at a later date the 2-year-old asked to see Downey's penis and he allowed her to stroke it four or five times. Further, Downey took photos of the 2-year-old that included pictures with his penis in her mouth.

Downey has also been involved in two other sexual acts with children. First, Downey was convicted in New York of an offense where he used a sleeping 5-year-old's hand to touch his penis through his underwear. For this crime, he was sentenced to a prison term but was granted 5 years of probation. While on probation for the above offense, Downey was accused of inappropriately touching his 9-year-old daughter when he was visiting her in Ohio. Downey stated that he touched his daughter but it was not done in a sexual way.

Downey told the court that he had not masturbated for over a year while he was in jail. Additionally, Downey stated that his use of drugs and alcohol lowered his sexual inhibitions. Then, Downey stated that he has made a conscious decision not to use drugs or alcohol, even though they are available to him while he is in prison.

3

Downey wrote a letter to his 2-year-old victim, but it was only a therapeutic exercise and it was never sent to her. Downey also wrote a letter to the 5-year-old victim, but he threw it away.

*Next we summarize Dr. Stephanie Adam's testimony.*

Dr. Adam, a clinical psychologist, evaluated Downey at Larned State Security Hospital in 2013. She conducted two interviews with Downey and administered four psychological tests.

Dr. Adam began her testimony by discussing Downey's sexual history. Downey told Dr. Adam that he was sexually abused by a babysitter from the ages of 3 until he was 9. Additionally, Downey was sexually exploited by males who gave him rides when he was hitchhiking as a teenager.

While Downey was an adolescent, he had a paper route and would go into houses to use their bathrooms. While there, he would masturbate and then eventually began smelling the women's soiled underwear while masturbating.

Downey was not able to answer the question of how many sexual partners he had because while serving in the military in the Philippines he solicited many prostitutes. Dr. Adam also knew of Downey's molestation of prepubescent children. Downey also had a dog lick his penis, and he ejaculated onto the dog's snout. Based upon this sexual history, Dr. Adam believed Downey had a deeply engrained sexual impulse that he did not seem to have the ability to control. This impulse increases the likelihood of Downey committing additional sexual offenses.

Based upon her interactions with him, Downey was "charming, humble, almost self-effacing at times and helpful." But these good displays concerned her because a

4

person would not make the connection between his past and the helpful person that he exhibited. Dr. Adam believed that this increased his risk to engage again in sexually violent behaviors.

Dr. Adam diagnosed Downey with various mental abnormalities or personality disorders including: pedophilia—sexually attracted to females, nonexclusive type—polysubstance dependence, fetishism, and antisocial personality disorder. Downey's pedophilia diagnosis is based on his convictions and his admissions of fantasizing about children while masturbating.

Downey's diagnosis of polysubstance dependence was based upon his prior drug and alcohol use. The diagnosis did take into account that Downey had stopped using drugs and alcohol while in the controlled environment of prison. Dr. Adam stated the polysubstance abuse disorder increases the risk of committing sexual offenses in the future. Although Dr. Adam knew Downey had stopped using drugs and alcohol in prison, she was concerned with his lack of a support system outside of the controlled environment. In Dr. Adam's opinion, it is important for a person in Downey's position to have a good support system because in order to maintain sobriety, a person must plan for the relapse.

Downey's fetishism diagnosis was based upon his repeated feeling and smelling women's underwear and using that to masturbate. Dr. Adam believed this mental abnormality increased Downey's likelihood to reoffend because it seemed to be compulsive.

Dr. Adam went on to state that people with antisocial personality disorder do not abide by the rules of a social contract. People with this diagnosis are not remorseful but are "impulsive, deceitful, conning, [and] manipulative . . . ." In relying on research, Dr. Adam stated that antisocial personality disorder is engrained and very hard to treat.

Additionally, a person with this disorder does not change when reaching adulthood; their activities may decrease as they get older, but the overall mindset does not change.

Dr. Adam concluded that Downey was a menace to the health and safety of society and was likely to engage in repeat acts of sexual violence. This conclusion was based in part upon her diagnoses as well as Downey committing additional sexual offenses while on probation for his assault on the 5-year-old.

Dr. Adam also analyzed Downey's likelihood to reoffend by using two actuarial tests—Static-99R and Static-2002R. The two tests differ in that the Static-2002R contains additional questions relating to previous offenses and probation and parole violations. Downey scored a one on the Static-99R, which places him in the low risk to reoffend category. On the Static-99R, 11.5 percent of offenders in the low risk category committed new offenses within 10 years of being released into the community. In comparison, 15.7 percent of offenders in the high-risk category on this test reoffended within the same period.

On the Static-2002R test, Downey scored a five, placing him in the moderate risk category. The recidivism rate for offenders in the moderate risk category on the Static-2002R is 25.1 percent. In comparison, the high-risk category had a recidivism rate of 28.4 percent.

In Dr. Adam's view, the Static test assessments underestimate the risk of recidivism. In discussing the shortcomings of the actuarial tests, Dr. Adam stated the tests are limited because they do not take a cumulative look at the person. Dr. Adam testified that it would fall below the standard of practice required for psychologists if one only used the actuarial test in determining the likelihood of recidivism.

In an interview with Dr. Adam, Downey did not acknowledge that he had raped the 2-year-old victim. According to Dr. Adam, Downey's failure to fully acknowledge this event shows Downey has not taken the first step to changing his behavior. Downey's statements concerning his actions with his 9-year-old daughter was, in Dr. Adam's view, clearly a denial. These denials increased Downey's risk of committing sexually violent acts in the future.

Dr. Adam also believed that Downey had serious difficulties controlling his behaviors. The problematic behaviors that Dr. Adam identified were sexual aggression towards children, alcohol and drug abuse, and his use of pornography. Dr. Adam also discussed how Downey's fetishism and use of pornography seemed to be compulsive which made it difficult for him to control his behaviors. While Downey had abstained from alcohol and drugs while in prison, the lack of a support system outside of prison concerned Dr. Adam.

In Dr. Adam's judgement and based upon her review of the available reports, interviews, and actuarial tests, Downey was likely to commit repeat acts of sexual violence.

*Here is the summary of Dr. Jane Kohrs' testimony.*

Dr. Jane Kohrs, a forensic psychologist with Correct Care Solutions, a contractor for the Department of Corrections, evaluated Downey in September 2012. She used various types of records, interviews, and the Static-99R to form her diagnosis. She stated that the policy in Kansas is to consider the actuarial tools in the context of all other information.

Dr. Kohrs was concerned about Downey's history of working at a carnival. The transient nature of Downey's past work allowed him to move to a new place when a

7

sexual offense charge was pending, making it easier to avoid responsibility for his actions. Additionally, the instability of the work increased the risk of reoffending.

She believed Downey was still in denial about the vaginal and anal injuries he caused his 2-year-old victim. This denial increased his risk for recidivism. In the interview with Downey, he denied causing the vaginal and anal injuries. Initially Downey accused the victim's grandfather of causing the injuries. Downey also stated that the victim's injuries might have been caused by falling on a milk crate.

Overall, Dr. Kohrs observed that Downey did not show empathy or concern for his victims' injuries, but rather gave a general nonintrospective response concerning how his actions affected their lives. She thought this response showed a detachment from the experiences of his victims, and would like to see a healthier response before a person is released into the public.

The doctor diagnosed Downey with pedophilia—nonexclusive type, attracted to females—fetishism, dysthymic disorder, and a personality disorder with paranoid traits. Dr. Kohrs also included Downey's substance abuse problems in her reports. She gave the same reasons for the diagnoses of pedophilia and fetishism as Dr. Adam. Dysthymic disorder is a low-level depression that was diagnosed while Downey was incarcerated.

Explaining her diagnosis of personality disorder with paranoid traits, Dr. Kohrs observed that Downey was suspicious of others, unwilling to confide, distant, and evasive. Dr. Kohrs based her assessment on personal contacts and reports. Specifically in the interview with Dr. Kohrs, Downey was very open when discussing his fetishism, but he avoided the conversation as it pertained to the rape and aggravated sodomy of the 2-year-old. This avoidance was a part of the basis for Dr. Kohrs concluding that Downey was likely to engage in sexually violent acts in the future.

8

Downey informed Dr. Kohrs that he had engaged in sexual relations with prostitutes two to three times per day while stationed overseas in the military. The sexual relations may have involved underage, pubescent females, but Downey was not sure. These sexual relations caused concern in Dr. Kohrs because it could become a source of fantasy or interest.

Dr. Kohrs believed that Downey was likely to commit future acts based upon his mental abnormalities and personality disorder. Downey has two paraphilic disorders—pedophilia and fetishism. Having two paraphilic disorders increases the risk of recidivism. When considering Downey's personality disorder in combination with the two paraphilic disorders, she testified their combination increases Downey's risk of reoffending.

The doctor acknowledged that Downey scored a one on the Static-99R, but despite that score, she believed that it was likely he would commit repeated acts of sexual violence. In reaching that conclusion, Dr. Kohrs relied upon various actions by Downey including: absconding and committing a new offense while on probation, noncompliance with supervision, intimacy deficits from having continual infidelities while married, instability in employment, the potential for substance abuse, and his history of sexual preoccupation and hypersexuality.

She also believed that Downey was resisting the cognitive behavioral sexual treatment program because he claimed to have already internalized the changes he thought were necessary. To Dr. Kohrs, this showed that Downey had a closed mind to the treatment and increased his risk of reoffending.

In her opinion, based upon her interview and reports, Downey has significant difficulty controlling his dangerous behaviors. Downey's dangerous behaviors are his sexual feelings, urges, and behaviors towards underage girls. Downey's prior use of

alcohol, pornography, and masturbation increases his risk in engaging in future sexually violent behaviors. Ultimately, Dr. Kohrs concluded that Downey satisfied the requirements for being a sexually violent predator.

*Dr. Jarrod Steffan testified for Downey.*

The record does not include Dr. Steffan's credentials. Dr. Steffan administered the Static-99R to Downey, but not the Static-2002R test. In his view, because the Static-2002R is newer and does not analyze samples of sex offenders from the United States, it is less valuable in assessing potential for recidivism compared to the Static-99R.

Dr. Steffan addressed why it is important to rely upon the factors in the Static-99R and exclude other clinical diagnoses for analyzing recidivism. In his view, the use of additional factors and clinical diagnoses does not increase the accuracy of determining likelihood for recidivism. Dr. Steffan concluded a more accurate assessment is given if you rely solely on the actuarial tests and not use any individual judgment.

Although Dr. Steffan concluded that Downey might have conditions that would qualify as a mental abnormality, he testified that Downey does not satisfy the statutory criteria as a sexually violent predator. While he agreed with the diagnoses of antisocial personality disorder, pedophilia, and fetishism, Downey's risk of recidivism was not increased compared to other sexual offenders.

The Static-99R was the only factor Dr. Steffan used in determining the likelihood of recidivism. Conversely, Dr. Steffan agreed with the State's assertion that having more than one paraphilic disorder increases the risk of recidivism. Dr. Steffan stated that others in the field would take exception to his opinions regarding the use of the Static-99R as the only tool in assessing the likelihood of recidivism.

10

In rebuttal, Dr. Adam stated that using only a Static test to assess recidivism is controversial. The research that supports the view that the Static test should be the only test used was funded by the company that produces the Static test. Additionally, Dr. Adam did not believe that the Static tests have been sufficiently peer reviewed to use them to the exclusion of other factors including clinical judgements. An additional problem with using the Static-99R is that the test only assesses actual charges or convictions, but not probation or parole violations, or self-reported acts of sexual violence.

*There is sufficient evidence here to support the court's finding.*

Downey argues on appeal that the district court had insufficient evidence to reach its conclusion that he is a sexually violent predator under the Act. In reviewing a claim on sufficiency of evidence under the Act, we must determine if the evidence, viewed in the light most favorable to the State, could lead a reasonable factfinder to the conclusion that the State demonstrated beyond a reasonable doubt that the individual is a sexually violent predator. *Williams*, 292 Kan. at 104. In determining the sufficiency of the evidence, this court does not reweigh the evidence or assess the credibility of witnesses. *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 371, 131 P.3d 540 (2006).

Basically, Downey relies on the fact that he scored in the low risk to reoffend category on the Static-99R to show the court erred in concluding that he presented an elevated risk of reoffending. He ignores the fact that Dr. Adam administered the Static-2002R and that test placed him in the moderate risk to reoffend category. Furthermore, a low score on an actuarial exam is not dispositive, and the State can meet its burden through presenting other evidence—such as clinical judgments. *Williams*, 292 Kan. at 111; see *In re Care & Treatment of Ritchie*, 50 Kan. App. 2d 698, 710-11, 334 P.3d 890 (2014).

11

We need not repeat all of the previous details we gleaned from the doctors' testimony. But clearly, the State presented sufficient evidence through the testimony of Drs. Adam and Kohrs that Downey had an elevated risk of recidivism.

We also note the even Dr. Steffan agreed that having a diagnosis of multiple paraphilic disorders is linked with higher rates of recidivism. Dr. Kohrs also stated that Downey's seemingly closed mind toward treatment elevated the likelihood that he would reoffend.

When we view this evidence in the light most favorable to the State, we must hold that a reasonable factfinder would conclude beyond a reasonable doubt that Downey is likely to commit repeat acts of sexual violence based upon his mental abnormalities or personality disorder. The district court had sufficient evidence to reach its conclusion on this element.

When we consider the second element of the statute that Downey contests, he contends there was insufficient evidence to support the conclusion that he cannot control his behaviors. He argues this was not proven because he has not received excessive disciplinary reports while in prison and he has abstained from drugs and alcohol while in prison even though they are available to him.

Again, without repeating all of the details, both Drs. Adam and Kohrs testified that Downey has serious difficulties controlling his behavior. Downey's pedophilia and fetishism are compulsive. In Dr. Kohrs' view, his fetish was a deeply engrained habit making it difficult to control.

Additionally, Downey's own expert, Dr. Steffan, was not firm in his opinion on whether Downey would have difficulty controlling his behaviors. He observed that

12

Downey was unable to control his behaviors prior to going to prison, but while incarcerated Downey was able to control himself.

Viewing the evidence in the light most favorable to the State, a reasonable factfinder could reach the conclusion beyond a reasonable doubt that Downey has serious difficulties controlling his behaviors, even though he has shown some control of his behaviors in a controlled environment.

We reiterate. Upon appellate review, we will not reweigh the evidence balancing the weight of one doctor's testimony against another. That is the task of the factfinder. From our review, clearly, the district court had sufficient evidence on both elements of the statute that were contested by Downey to conclude that he was a sexually violent predator as defined in the Act.

Affirmed.