No. 104,092

STATE OF KANSAS, *Appellee*, v. MELISSA WELLS, *Appellant*.

(305 P.3d 568)

Opinion filed June 28, 2013.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: This is defendant Melissa Wells' direct appeal from jury convictions of felony murder and child abuse, stemming from the death of 23-month-old B.C. Wells was sentenced to consecutive terms of life and 55 months' incarceration with lifetime postrelease supervision. She claims several errors entitle her to reversal on appeal, including failure to give a limiting instruction; prosecutorial misconduct; denial of her request for substitute counsel; multiplicitous convictions; exclusion of letters she wrote after her arrest; and failure to give lesser included offense instructions. She also claims error in the sentencing judge's nunc pro tunc order

setting out postrelease supervision rather than parole. We affirm Wells' convictions and vacate the postrelease portion of her sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

Victim 23-month-old B.C. died on January 20, 2008, after spending 3 days in the hospital. Wells, B.C.'s father's girlfriend, had been caring for B.C. at the time she entered the hospital.

Before Wells' trial, the State moved to admit what it classified as K.S.A. 60-455 evidence. That evidence included testimony of Larry Crosetto, B.C.'s maternal grandfather, about changes in B.C.'s behavior and bruises and marks he observed on B.C. after she had gone to live with B.C.'s father and Wells. The district judge ruled that the evidence from Crosetto was admissible.

*Crosetto's Testimony*

Crosetto testified that his daughter, Angela, had been married to Randy Coons and had two children with him, B.C. and C.C. When Angela and Coons became estranged and planned to divorce, Crosetto and his wife, Mary, took care of the children at their home in Coffeyville while Angela attended college in Pittsburg. After Angela graduated and went to work in Wichita, the children moved in with her. But Angela became ill and died a few months later. The children then moved back to Coffeyville and lived with Crosetto and his wife until Coons "came and took them away" in late August 2007. The Crosettos continued to keep the children with them on weekends.

Crosetto said that B.C.'s behavior changed during this period after she moved to her father's house. She became "totally fearful of going back" there and would cling to Crosetto and his wife when they tried to drop her off. B.C. also had unexplained injuries, Crosetto said, and he took notes about them and took photographs of them. The photos were shown to Wells' jury. Crosetto said that he had wanted to keep a record of the injuries to support a possible child in need of care case.

Looking back over his notes, Crosetto testified specifically that, on September 6, 2007—a day before he was to pick the children

up—Coons called to alert him that B.C. had fallen. According to Coons, he did not want Crosetto to be surprised when he saw B.C. was bruised, particularly around her face.

In anticipation of the following weekend's visit, Coons again called Crosetto to alert him that B.C. had fallen and had to have stitches. When Crosetto picked B.C. up for that weekend visit, he observed stitches in her lip.

From early September through December, Crosetto documented bruising across B.C.'s ribs, on her back, on her shoulder, and recurring bruising above each buttock. He documented bruising to her cheeks, eyelids, forehead, and legs. He documented damage to her chin; marks that he later learned were flea bites; and, on one occasion, two black eyes. He testified that Coons' two calls in September were the only times that explanations were offered for B.C.'s injuries.

Crosetto told Coons and Wells that he was going to make a report to the Kansas Department of Social and Rehabilitation Services, now the Department of Children and Families. And he did in fact make two calls to SRS and met with an SRS representative about getting the children out of their father's home. On advice from the Crosettos' family physician, Dr. Allen Gillis, who had observed B.C.'s injuries and believed she might be a victim of abuse, Crosetto also took B.C., without her father's knowledge, to be examined by Dr. Chan Han on Christmas Eve. Han made a police report. On January 6, 2008, Crosetto dropped B.C. off at her father's; that was the last day he saw B.C. alive.

Crosetto also testified that Coons had agreed that the Crosettos should become conservators for the children to preserve Angela's life insurance proceeds. The conservatorship was finalized at the end of October 2007, at which time Crosetto learned that the Social Security Administration had been paying "survivor benefits" to Coons. Beginning in January 2008, these benefits—totaling $518 per month—were no longer going to be paid to Coons but were going to be paid to the Crosettos as conservators.

On cross-examination, defense counsel suggested that Crosetto had never approved of Coons, and that the "fight over the children" was between Crosetto and Coons rather than Wells. Crosetto said

that he suspected abuse in the house; that Wells was the primary caregiver; that he had reported the abuse and nothing happened; and that B.C. was now dead. He testified that "it had become obvious that [Wells] was making the decisions on how the kids were handled, how and when we saw them, and I guess that she was deciding what punishment was to be given when the children misbehaved."

*Medical and Law Enforcement Testimony*

The State's other trial evidence came mainly from law enforcement and medical personnel. Gillis and Han both testified about their observations of B.C. before January 17, 2008, and their concerns that abuse was occurring. Han testified that the facial bruising he observed at the December 24 examination was "non-accidental injury."

Other testimony established that, midmorning on January 17, 2008, a hysterical Wells called Coffey County 911 to report a child who was not breathing. Officer Mike Bradley arrived on the scene within a minute to find Wells on the front porch holding B.C. Bradley checked for B.C.'s pulse, detected it, cleared her airway, and was beginning cardio pulmonary resuscitation as emergency medical personnel arrived. After taking steps to stabilize B.C., the emergency personnel transported B.C. to the Coffeyville Regional Medical Center.

Officer Steven Gilfillan testified that, when he arrived at the house, Wells told him that K.W., her 2-year-old daughter, had jumped on B.C.'s stomach, causing B.C. to vomit. Then B.C. began to "flop around on the floor like she was having a seizure" and hit her head.

Emergency medical personnel testified that they were told that B.C. had fallen from a high chair and hit her head.

Dr. James Christensen treated B.C. when she came in to the Coffeyville emergency room. Christensen observed multiple bruises on B.C.'s head and face and noted that her pupils were dilated, indicating head trauma. A CT scan revealed bleeding under B.C.'s skull that was not consistent with a mere fall. Based on the injuries he observed, Christensen suspected abuse rather than

accidental trauma. He arranged for B.C. to be flown to Tulsa, Oklahoma, for treatment by a pediatric neurologist.

In Tulsa, B.C. was examined by several doctors, including Deborah Lowen and Stephen Groves, both of whom testified at trial. Lowen, a pediatrician specializing in abuse and neglect, testified regarding the nature of B.C.'s bruising, which was concentrated on her head and upper extremities and in nonbony areas rather than on lower extremities and bonier areas. Lowen opined that the history provided to her—that B.C. was injured by a 2-year-old jumping on her stomach, followed by some type of seizure or fall—was inconsistent with the external injuries she observed. Additional CT scans revealed brain swelling and more subdural bleeding in the brain, indicating to Lowen that the first scan—in Coffeyville—was done very close in time to the occurrence of the head injury.

Groves, a specialist in pediatric ophthalmology, observed significant hemorrhages in B.C.'s left retina, and retinoschisis, a splitting of the retinal layers. He testified that these injuries indicated almost to a certainty that B.C. had suffered nonaccidental abusive head trauma, i.e., shaken baby syndrome. He opined that there was no accidental explanation for the injuries observed, and that B.C.'s injuries were not the type that would result from a fall—from a high chair or down stairs or off of a bed; from a bump against an entertainment center; or from another child hitting B.C. on the head, jumping on her stomach, or hitting her with a doll (all explanations Wells offered at one time or another).

After B.C.'s death on January 20, 2008, Dr. Erik Mitchell performed an autopsy. He found severe bruising on B.C.'s head, which he determined was inflicted by hard blows. He found a large subdural hematoma, or clotting, inside her skull cavity, as well as evidence of severe swelling. He also found evidence of hemorrhaging in the optic nerve, which he considered to be strong evidence of "a shaking event." He testified these injuries were not consistent with another child bouncing on B.C., or hitting her on the head, or with a fall. Mitchell concluded that B.C.'s death was a homicide, the result of head trauma with both impact injury and rotational—shaking—injury.

*Wells' Statements*

Wells was interviewed four times before her arrest, and she offered various descriptions of the events precipitating her 911 call about B.C. At Wells' initial interview, shortly after the call, she told Detective Diane George that K.W. had been bouncing on B.C., that B.C. tried to or did vomit, and that B.C. then stopped breathing. Wells said she tried to clear B.C.'s throat to help her vomit. When asked specifically if she had shaken B.C., Wells said she had not.

The following day, George confronted Wells with the medical conclusion that B.C. had suffered head trauma. Wells then said B.C. had fallen down some stairs about 2 weeks earlier; that, on the morning of the 911 call, K.W. had kicked B.C. off of a bed and B.C. had hit her head on a plastic tote; that K.W. had hit B.C. in the head with a plastic doll; and that B.C.'s head hit an entertainment center while Wells was carrying her outside. In response to additional questioning, Wells repeatedly denied shaking B.C., but she ultimately admitted that she had shaken B.C. three or four times.

In an interview conducted 3 days after B.C.'s death, Wells reiterated that K.W. had been bouncing on B.C. and had hit her with a doll. She also said that B.C. had rolled off the bed. Wells also again admitted shaking B.C. and said B.C. vomited and had the seizure after she was shaken. Wells admitted that she shook B.C. "pretty hard"—possibly hard enough to cause serious injury or death.

In the fourth interview a few days later, Wells admitted that she might have caused some of the bruising on B.C. when she was frustrated with her. She again admitted to shaking B.C. In Wells' final version of events, B.C. began vomiting, which caused Wells to shake her, which resulted in B.C. seizing and hitting her head on the floor. Wells stated: "It's all my fault."

At trial, there was other testimony concerning Wells' explanations for B.C.'s ultimately fatal injury. Coons' grandfather, Delbert, testified that he drove Coons and Wells to Tulsa on January 17. When he asked Coons what had happened, Coons told him that

B.C. had fallen out of the high chair. Wells did not correct Coons or offer any other explanation.

A friend of Wells, who was an occasional babysitter for B.C., testified that she talked to Wells on the day of B.C.'s death, January 20, and Wells said that K.W. was jumping on B.C.; that B.C. vomited or tried to vomit and turned blue; that Wells shook B.C.; and that Wells hit B.C.'s head against an entertainment center while carrying her out to meet the ambulance. Wells told her niece the same story. She told her son's grandfather three different stories. Sometime after B.C.'s death but before Wells' arrest, she mentioned to another witness that she "was playing with [B.C.] and didn't realize she was shaking her that hard." After Wells' arrest but before trial, she confided to a cellmate that she had become upset over a phone call, that B.C. was crying, and that she ended up "thumping" and shaking B.C.

There was also testimony at trial that Wells and Coons argued; that she was often stressed, overwhelmed, and frustrated. Other testimony depicted Wells as calm; as possessing a quiet demeanor; and as liked by the children, including B.C. No one testified that he or she saw Wells hurt the children.

*Wells' Case*

Wells offered the testimony of Dr. Thomas Young, a forensic pathologist. Young opined that, based on his examination of Mitchell's autopsy photos, B.C.'s medical records, and preliminary hearing testimony, the injuries to B.C. were accidental. He testified that her injuries were attributable to hypoxic ischemic encephalopathy, or a lack of oxygen to the brain, resulting from cardiac arrest caused by a seizure, which was caused by an earlier head injury—in this case, falling down the stairs a fortnight before Wells' 911 call. Young testified that he found no evidence of abusive injury, abusive head trauma, or shaken baby syndrome. On cross-examination, he testified that he believed all of the health care professionals who had testified for the State were "mistaken."

Wells took the stand and testified that, on the morning of January 17, she fed and bathed the girls and started a movie. K.W. was sitting or bouncing on B.C. Wells moved K.W., but a few

minutes later, K.W. was doing it again. Then Wells noticed that B.C.'s lips were blue and B.C. looked like she was choking or trying to vomit. Wells did a "finger sweep" of her mouth, then began hitting her on the back to see "if something might fly out." At this point, B.C. was not breathing. Wells looked around the house for her phone and then found it in her pocket. She called 911. Before police arrived, she "ended up shaking" B.C. Wells testified: "I grabbed [B.C.] by the shoulders and I just shook her really hard."

Over the State's objection, Wells testified that when she heard about Young's report, she was "ecstatic." She also offered testimony tending to discredit the testimony of her former cellmate.

*The Verdict and Appeal*

The jury found Wells guilty of both felony murder and the underlying felony of abuse of a child. In Wells' unsuccessful motion for a new trial, she argued, among other things, that K.S.A. 60-455 evidence was erroneously admitted; that various letters to her children and friends were erroneously excluded; and that the district judge erred in failing to sustain her objections to questions about Young's compensation.

The district court sentenced Wells to consecutive terms of life on the off-grid felony murder and 55 months' incarceration with 24 months' postrelease supervision on the abuse of a child. An order nunc pro tunc changed the postrelease supervision term for the off-grid felony-murder offense from parole to lifetime postrelease. This appeal followed.

While Wells' appeal was pending, we decided *State v. Berry,* 292 Kan. 493, 254 P.3d 1276 (2011), in which we abandoned the judicially created felony-murder rule that lesser included offense instructions are required only when evidence of the underlying felony is weak, inconclusive, or conflicting. See *State v. Reed,* 214 Kan. 562, 564, 520 P.2d 1314 (1974). We held, in accord with then-K.S.A. 22-3414(3), that lesser-included offense instructions are proper in felony-murder cases when there is "some evidence reasonably justifying a conviction of some lesser included crime beyond a reasonable doubt." *Berry,* 292 Kan. 493, Syl. ¶ 6. We noted that our decision, as a new rule for the conduct of criminal pros-

ecutions, would apply to cases pending on direct review or not yet final. *Berry*, 292 Kan. at 514.

Wells submitted a supplemental brief, arguing that, in light of *Berry*, the district court's failure to instruct on the lesser offenses of second-degree (reckless) murder and involuntary (reckless) manslaughter was clearly erroneous. The State filed a response brief, arguing that evidence at trial would not have reasonably justified a conviction of either second-degree (reckless) murder or involuntary (reckless) manslaughter.

Subsequently, the statute governing lesser included offenses was amended, presumably in response to *Berry*, to state: "[T]here are no lesser degrees of murder in the first degree under subsection (a)(2) of K.S.A. 21-5402 [the felony-murder statute], and amendments thereto." K.S.A. 2012 Supp. 21-5109; L. 2012, ch. 157, sec. 2. The State then filed a Rule 6.09(b) letter on January 8, 2012, arguing that the amended statute was applicable to Wells' case and thus there was no error in failing to instruct on lesser included offenses. See 2012 Kan. Ct. Annot. 49.

## DISCUSSION

*Absence of Limiting Instruction on K.S.A. 60-455 Evidence*

Wells argues that the district judge should have instructed her jury on how to consider Crosetto's testimony regarding possible prior abuse to safeguard against impermissible propensity conclusions. Because there was no request for a limiting instruction, we would review for clear error on appeal, pursuant to K.S.A. 22-3414(3). See, *e.g., State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012) (clearly erroneous standard applies to absence of instruction not requested).

We need not address Wells' arguments about a K.S.A. 60-455 limiting instruction, however, because we agree with the State's argument on appeal that Crosetto's testimony did not qualify as K.S.A. 60-455 evidence. The State's initial district court motion characterizing it as such is not legally binding on this court.

Crosetto did not testify that Wells abused B.C. before January 17. Indeed, Crosetto never pointed to any "specific incident of abuse" by Wells. He testified only to observations he made of

B.C.'s physical condition and to efforts he undertook to follow up on his observations. We find no error, let alone clear error, in admitting this evidence without a limiting instruction. This claim of error fails.

*Prosecutorial Misconduct*

Wells argues the prosecutor committed misconduct denying her a fair trial by implying to her jury that, because Young was being paid, he was not credible, or was not as credible as the State's experts.

Over Wells' relevance objection, the prosecutor cross-examined Young about the compensation he expected to receive in exchange for his work on the case. Young testified that he charged $300 per hour, including travel time to and from the courthouse, and that he had spent more than 10 hours on case-related work. During closing, and without objection, the prosecutor pointed out that Young's ultimate opinion—that the death was accidental—was contrary to that of the State's six experts. The prosecutor told the jury it needed to determine the credibility of each witness and consider the motivations each witness might have. Later in closing, the prosecutor asked the jury whether there were "at least $3,500 worth of reasons" for why Young testified that B.C.'s death was accidental.

A claim of prosecutorial misconduct based on comments made during voir dire, opening statements, or closing argument will be reviewed on appeal even absent a contemporaneous objection. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). But a contemporaneous objection is necessary to preserve all prosecutorial misconduct claims involving evidence admission and exclusion, such as those arising out of questions posed by a prosecutor and responses to those questions. *King*, 288 Kan. at 349. Here, Wells does not base her appellate issue on the admission of evidence of Young's hourly rate or of the amount of time he spent on the case. Rather, she objects to the prosecutor's use of this evidence to imply during closing argument that Young was not credible and/or that the State's witnesses were more credible. This means this part of the issue is properly before us on appeal.

We first determine whether there was error, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. If error exists, we then determine whether the improper comments compel reversal, *i.e.*, whether they prejudiced the jury against the defendant and denied the defendant a fair trial. *Burnett*, 293 Kan. at 850.

We conclude in this case that the prosecutor's closing comments about Young tread very close to the error line but did not cross it. Although a prosecutor is not permitted to offer his or her opinion on the credibility of a witness, the State is correct that Kansas courts have consistently held that "[e]xposing bias or motive for testifying is a proper subject for cross-examination," and, "by extension, the prosecutor is free to argue this point to the jury if the evidence has established the facts." *State v. Jones*, 273 Kan. 756, 783, 47 P.3d 783 (2002) (prosecutor's points that expert was paid for testimony, that such arrangements may influence resulting opinion proper subject for cross-examination, closing argument).

The Court of Appeals' error evaluation in *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 131 P.3d 540 (2006), a case relied on by Wells, is distinguishable on its facts. In *Ward*, the panel held that the prosecutor's statement in closing, "if [defendant's expert] was paid to say 2 plus 2 equals 5, he would do it," was improper because it was without any evidentiary foundation. 35 Kan. App. 2d at 373. The prosecutor's explicit comment on credibility and its lack of support in the evidence were key. Two New Jersey cases cited by Wells also are factually distinct and unhelpful. See *State v. Smith*, 167 N.J. 158, 183-85, 188, 770 A.2d 255 (2001) (misconduct in telling jury that defense experts with "hefty fees" "shaded their testimony" in hope of future employment reversible; verdict hinged on experts' credibility); *State v. Negron*, 355 N.J. Super. 556, 810 A.2d 1152 (2002) (repeated, baseless arguments that defense expert's testimony fabricated reversible).

We acknowledge that when a party exposes and argues potential bias, prejudice, or some motive other than truth-telling for a witness' testimony, the implication nearly always is that the witness is lying. But making an explicit comment on credibility to a jury is misconduct. Here, there was no error in the prosecutor's inquiry

about Young's compensation. Nor was it error to ask the jury to consider that compensation in evaluating Young's testimony. See *Jones*, 273 Kan. at 783 (no misconduct when prosecutor made point that defendant's expert paid for testimony; arrangement may influence what expert has to say). But asking the jury whether there were "at least $3,500 worth of reasons" for why Young would testify as he did comes dangerously close to saying, rather than suggesting, that Young must be lying. The line of separation is a thin one; were it drawn with chalk, the prosecutor's shoes would need buffing. But, considering the record as a whole and the context in which the challenged statements appear, the closing argument stayed just within the bounds of proper comment on the evidence.

## Request for Substitute Counsel

After Wells' arrest, Philip J. Bernhart of the Southeast Kansas Public Defender's Office was appointed to represent her. At a hearing via telephone conference, before Wells' preliminary hearing, counsel alerted the court that Wells "just advised me that she does not want me as her attorney." The district judge inquired whether there was any particular reason Wells did not want Bernhart to represent her. Wells said, "[B]ecause I had him the last time and I didn't feel properly represented." The district judge replied:

"Well, that's not grounds to not have Mr. Bernhart represent you, so your request will be declined. Mr. Bernhart has appeared several times in front of this Court. He's a very effective attorney and I know for a fact that he has tried very similar cases before and done a very excellent job. So your request will be declined, because you haven't shown the correct grounds."

There was no further mention of the issue.

On appeal, Wells argues that the failure to conduct any further inquiry or investigation upon her notice of dissatisfaction with Bernhart violated her Sixth Amendment right to counsel. Generally a district judge's refusal to appoint new counsel is reviewed under an abuse of discretion standard. *State v. Sappington*, 285 Kan. 158, Syl. ¶ 4, 169 P.3d 1096 (2007). Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact.

*State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Wells suggests that our review should be de novo, because the district judge did not engage in the correct legal analysis, *i.e.*, failed to make an appropriate inquiry before denying the request. But abuse of discretion covers failure to engage in the correct legal analysis. *State v. Hulett,* 293 Kan. 312, 318, 263 P.3d 153 (2011) ("In order for a district court decision to receive a full measure of this court's deference under the abuse of discretion standard, it must have been based upon a correct understanding of the law.") (citing *State v. White,* 289 Kan. 279, 284-85, 211 P.3d 805 [2009]). The burden of demonstrating error is on the party alleging the abuse. *Hulett,* 293 Kan. at 318; *State v. White,* 284 Kan. 333, 342, 161 P.3d 208 (2007).

The Sixth Amendment to the United States Constitution guarantees an indigent criminal defendant the right to the assistance of counsel in his or her criminal defense. However, such a defendant cannot compel the district court to appoint the counsel of defendant's choice. To warrant substitute counsel, a defendant must show "justifiable dissatisfaction" with his or her appointed counsel. *State v. Bryant,* 285 Kan. 970, 986-87, 179 P.3d 1122 (2008); *State v. Hegwood,* 256 Kan. 901, 903, 888 P.2d 856 (1995). Justifiable dissatisfaction may be demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. *Bryant,* 285 Kan. at 986. " ' "[A]s long as the trial court has a reasonable basis for believing the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel." ' " *Bryant,* 285 Kan. at 986-87 (quoting *State v. Ferguson,* 254 Kan. 62, 70, 864 P.2d 693 [1993] [quoting *State v. Banks,* 216 Kan. 390, 394, 532 P.2d 1058 (1975)]).

Historically, we have usually reserved the "abuse of discretion" label for situations when a district judge has made no inquiry at all, see *State v. Taylor,* 266 Kan. 967, 973-77, 975 P.2d 1196 (1999) (district court abused discretion by denying defendant's motion to withdraw plea when, at sentencing hearing, defendant requested

continuance to secure new counsel; record suggested justifiable dissatisfaction with appointed counsel; district judge made no inquiry before denying continuance, suggested defendant proceed pro se), or when the judge has made no further inquiry in the face of a clear indication of conflict, see *State v. Galaviz*, 296 Kan. 168, 291 P.3d 62 (2012) (district judge has a duty to inquire when there is objection to attorney's concurrent representation of multiple clients with antagonistic interests; failure to perform duty requires automatic reversal); *Vann*, 280 Kan. at 792 (district judge abused discretion—after several express allegations of conflict between attorney, client—by failing to inquire further); *State v. Jasper*, 269 Kan. 649, 653-54, 8 P.3d 708 (2000) (same).

Recent Kansas cases touching on this area of law suggest that "an articulated statement of attorney dissatisfaction is necessary to trigger the district court's duty to inquire into a potential conflict," *State v. Rand*, No. 106,774, 2012 WL 6634397, at *5 (Kan. App. 2012) (unpublished opinion), and "lackluster advocacy does not equate to an obvious conflict that must receive immediate, on-the-record attention from the district court." *Hulett*, 293 Kan. at 323.

Contrary to Wells' characterization of the exchange in this case, the district court did inquire into her reasons for requesting new counsel. The judge asked, "Ms. Wells, any particular reason why you do not want Mr. Bernhart to represent you?" Wells' response did not suggest a conflict of interest, an irreconcilable disagreement, or an inability to communicate with counsel. Her response did not suggest that the attorney-client relation had "deteriorated to a point where appointed counsel [could] no longer give effective aid in the fair presentation of a defense." *Bryant*, 285 Kan. at 986-87.

We conclude that, because Wells' response to the district judge's first question implicated none of the grounds warranting further inquiry—let alone warranting substitute counsel—the judge was under no duty to inquire further, and he did not abuse his discretion in refusing to appoint new counsel. See *State v. Richardson*, 256 Kan. 69, 81-82, 883 P.2d 1107 (1994) (denial of motion for new counsel during sentencing phase not abuse of discretion; defendant had opportunity to explain dissatisfaction; court stated rea-

sons why defendant's concerns baseless; communication between defendant, counsel not broken down entirely); *cf. State v. Robertson*, 30 Kan. App. 2d 639, 44 P.3d 1283 (2002) (denial of counsel's motion to withdraw abuse of discretion; defendant had filed disciplinary complaint against counsel; counsel told judge of "total breakdown in communication").

*Alternative Means*

Wells argues that, because the State charged her with killing B.C. "in the commission of" *or* "in an attempt to commit" the inherently dangerous felony of abuse of a child and because the district judge included the same two possibilities in the jury instruction on felony murder despite the State's failure to prove mere attempt, reversal of her felony-murder conviction is required. Attempted child abuse and completed child abuse, Wells asserts, are two different crimes constituting alternative means of committing felony murder that must both have been proved beyond a reasonable doubt in order to insure the statutorily required jury unanimity to which she was entitled. See *State v. Wright*, 290 Kan. 194, 201, 224 P.3d 1159 (2010).

Wells' first potential obstacle is issue preservation. Before the district judge, she voiced no complaint when the State filed its proposed jury instruction including this language. Her counsel specifically did the opposite, filing a written response that stated Wells did "not object to the State's proposed instructions." Wells now argues that this court should nevertheless consider the merits of her alternative means argument because a refusal to do so imperils her fundamental right to a unanimous jury. As in our recent case of *State v. Cheffen*, 297 Kan. 689, 699, 303 P.3d 1261 (2013), the State does not challenge Wells' characterization of the right to jury unanimity as a fundamental right. Rather, it argues that the true issue before us should not be classified as alternative means at all but as a jury instructions defect that cannot compel reversal unless it qualifies as clearly erroneous under K.S.A. 22-3414.

For our part, on the preservation debate, we acknowledged in *Cheffen* that earlier Court of Appeals cases have taken up the merits of an alternative means issue for the first time on appeal because

it implicates sufficiency of the evidence. *Cheffen*, 297 Kan. at 699-700 (citing *State v. Shaw*, 47 Kan. App. 2d 994, 1000, 281 P.3d 576 [2012], *petition for rev. filed* August 10, 2012; *State v. Rivera*, 42 Kan. App. 2d 914, 918, 218 P.3d 457 [2009], *rev. denied* 290 Kan. 1102 [2010]); see also *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008) ("There is no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal.").

As in *Cheffen*, we will address the merits of Wells' alternative means issue arguments. Wells insists that there was insufficient evidence of an attempted abuse of a child that resulted in B.C.'s death because B.C., in fact, died. The State does not argue that evidence of an attempt was sufficient; rather, it argues that attempt was never in issue and that the felony-murder instruction's reference to it was surplusage not backed up by any definition of attempt. It cites to our decision in *State v. Bailey*, 292 Kan. 449, 255 P.3d 19 (2011).

The first problem with the State's argument is that any language in *Bailey* that could be read to apply to analysis of the alternative means argument made by Wells in this case has been superseded by our later decisions in *State v. Brown*, 295 Kan. 181, 284 P.3d 977 (2012), and, even more specifically, *Cheffen*, 297 Kan. at 699-702.

*Brown* set out the general framework for detecting when a criminal statute and an instruction incorporating its language provide for alternative means of committing the crime.

"In examining legislative intent, a court must determine *for each statute* what the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus,* and, in some statutes, a causation element? Or is it merely to describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. [Citation omitted.]" 295 Kan. at 194.

*Cheffen* applied the *Brown* framework when a defendant convicted of felony murder based on the underlying felony of abuse

of a child claimed that the State failed to prove attempted abuse of a child even though the felony-murder instruction referenced attempt as well as the completed crime. *Cheffen*, 297 Kan. at 702. The discussion in *Cheffen* is on point and controlling here.

Cheffen was charged with felony murder under K.S.A. 21-3401, which provides:

"Murder in the first degree is the killing of a human being committed:

. . . .

"(b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 . . . ." K.S.A. 21-3401.

The jury instruction issued in Cheffen's case omitted the "flight from" language in the third phrase, but we noted that, as a practical matter, the alternative means analysis is the same for all three phrases in the felony-murder statute.

The second problem with the State's argument is that *Cheffen* was distinct from *Bailey*, because in *Bailey*, the defendant was charged with felony murder based on two different underlying felonies, aggravated burglary and robbery. This court held that "different underlying felonies supporting a charge of felony murder are alternative means rather than multiple acts." 292 Kan. at 458. Cheffen, like Wells, was charged only with one underlying felony—abuse of a child. And Cheffen's alternative means claim on appeal was based on the same statutory language: "in the commission of" and "attempt to commit." See K.S.A. 21-3401.

In *Cheffen*, we held that

"[t]he legislature did not intend to create alternative means of committing felony murder under K.S.A. 21-3401(b) by providing that felony murder occurs when there is a death 'in the commission of, attempt to commit, or flight from an inherently dangerous felony.' Instead, the phrase 'in the commission of, attempt to commit, or flight from' describes factual circumstances sufficient to establish a material element of felony murder." 297 Kan. 689, Syl. ¶ 6.

Consistent with *Cheffen*, we hold that the three phrases in the felony-murder statute—"in the commission of, attempt to commit, or flight from"—are simply factual circumstances in which a material element may be proven, and do not create alternative means. The State was not obligated to prove that Wells killed B.C. during an attempt to commit child abuse.

*Exclusion of Evidence*

On the State's relevance objection, the district judge excluded from evidence 12 letters Wells wrote after her arrest in this case. She had offered the letters to rehabilitate her character. On appeal, she argues that the judge erred because the letters appropriately rebutted the State's evidence that she was an "abusive and uncaring parent." She further argues that the error necessitates reversal because it impaired her ability to develop her defense that she was a "caring and non-abusive parent" and was "innocent."

A defendant's right to present a defense is not without limits, including statutory rules and caselaw interpreting of rules of evidence and procedure. *State v. Martis*, 277 Kan. 267, 286-87, 83 P.3d 1216 (2004) (refusal to admit letter); *State v. Alexander*, 268 Kan. 610, 616, 1 P.3d 875 (2002) (refusal to admit photographs). Every decision to exclude evidence proffered by a criminal defendant does not amount to a constitutional violation.

When reviewing a district court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant, that is, whether it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). There are two elements of relevance: materiality and probative value. *State v. Houston*, 289 Kan. 252, 261-62, 213 P.3d 728 (2009); K.S.A. 60-401(b). In analyzing whether evidence is material, the focus is on whether the fact sought to be proved has a legitimate and effective bearing on the decision of the case and is in dispute. See *State v. Peppers*, 294 Kan. 377, 387, 276 P.3d 148 (2012). Evidence is probative if it has " 'any tendency in reason to prove' " a material fact. *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008). The materiality of evidence is reviewed de novo, and the existence of probative value is reviewed under an abuse of discretion standard. *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010).

Four of the 12 letters were addressed to Wells' children, expressing how much she loved them and missed them. The other letters were addressed to various of Wells' friends and acquaintances and expressed her views on the evidence for and against her, her joy and relief at learning of Young's medical opinion, and the circumstances of her incarceration.

The district court properly excluded these 12 letters. The issues at trial were whether Wells had knowingly shaken B.C., resulting in great bodily harm, and whether she killed B.C. during the commission of an inherently dangerous felony, *i.e.*, abuse of a child. K.S.A. 21-3401(b) (defining first-degree felony murder); K.S.A. 21-3609 (defining abuse of a child). The information contained in the proffered letters had no bearing on these issues; was cumulative to evidence already before the jury; and/or constituted impermissible comment on the credibility of witnesses. See *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 646 P.2d 1091 (1982) (trial court properly excluded as irrelevant to issue of discriminatory prosecution letters written by defendants to Attorney General after investigation in case had begun); *Crum v. Long*, No. 102,178, 2011 WL 148892, at *7 (Kan. App. 2011) (unpublished opinion) (letters properly excluded when they had no tendency to prove claims at trial).

*Lesser Included Offense Instructions*

Wells also argues that she was entitled to instructions on lesser included offenses of felony murder under our decision in *Berry*. The State argues that *Berry*'s holding was overruled by statutory amendments and that the amendment forecloses Wells' reliance on *Berry*. See K.S.A. 2012 Supp. 21-5109(b)(1); L. 2012, ch. 157, sec. 2. The 2012 amendment to K.S.A. 21-5109(b)(1) provides that there are no lesser included offenses of felony murder.

On this issue, we must deal first with Wells' suggestion, made at oral argument, that the State's failure to file a supplemental brief should be fatal to its ability to advance its argument for applicability of the amended statute. We reject this suggestion. The State's 6.09(b) letter was a permissible and sufficient vehicle to ensure our awareness of potentially controlling authority. See Kansas Supreme Court Rule 6.09(b)(1)(A) (2012 Kan. Ct. R. Annot. 49). Moreover, the State has not raised a new issue here, only new authority on an issue already before us.

We have not previously ruled on the effect of the 2012 amendment on cases on direct appeal. See, *e.g.*, *State v. Phillips*, 295 Kan. 929, 934, 287 P.3d 245 (2012) (defendant tried, convicted while

*Berry* in effect; statute amended while case on direct appeal but "[n]o claim [was] made that this revision [affected] the present analysis"; defendant abandoned claim of entitlement to lesser included offense instructions).

The general rule is that a statute operates only prospectively unless there is clear language indicating the legislature intended otherwise. *State v. Martin*, 270 Kan. 603, 608-09, 17 P.3d 344 (2001); *State v. Sisk*, 266 Kan. 41, 44, 966 P.2d 671 (1998). An exception to this rule has been employed when the statutory change is merely procedural or remedial in nature and does not prejudicially affect the substantive rights of the parties. *Martin*, 270 Kan. at 608-09; *State v. Ford*, 262 Kan. 206, 208, 936 P.2d 255 (1997).

In this instance, we conclude that the amendment is not merely procedural or remedial. It effectively states that no felony-murder defendant is entitled to lesser included offense instructions on that charge. In contrast, both the pre-*Berry* rule and the rule under *Berry* recognized lesser degrees of felony murder. The statutory extinguishment of these lesser included offenses is a substantive change, indeed, one that may have constitutional ramifications. See *State v. Brooker*, 27 Kan. App. 2d 396, Syl. ¶ ¶ 4-5, 400, 4 P.3d 1180 (2000) (noting 1998 amendment to K.S.A. 22-3414 applying clearly erroneous standard of review to claims of error in failing to instruct on lesser included offenses procedural; "[t]he substantive right of defendant to have the jury instructed on all lesser included offenses is unaffected"); see also *Boltz v. Mullin*, 415 F.3d 1215, 1233 (10th Cir. 2005), *cert. denied* 126 S. Ct. 1631 (2006) (due process requires giving lesser included offense instruction when evidence warrants it); see also *Brewer v. Overberg*, 624 F.2d 51, 52 (6th Cir. 1980) (state court's failure to instruct on lesser included offenses may violate Fourteenth Amendment by depriving the defendant of fundamental right to fair trial); *State v. Camacho*, 337 N.C. 224, 234-35, 446 S.E.2d 8 (1994) (same); see also 75A Am. Jur. 2d, Trials §§ 1198, 1202.

Given no retroactivity for the statutory amendment, the rule of *Berry* governs here. And Wells can invoke this rule to her advantage if she can persuade us that instructions of any lesser degree

of homicide were appropriate. Under *Berry*, felony-murder prosecutions such as this follow the general statutory rule that lesser included instructions supported by evidence should be given. *State v. Simmons*, 295 Kan. 171, Syl. ¶ 3, 283 P.3d 212 (2012).

The key phrase in the preceding sentence is "supported by evidence." In this case, under *Berry*, no instructions for any lesser degree of homicide were called for on the felony-murder count because there was not "some evidence reasonably justifying a conviction of some lesser included crime beyond a reasonable doubt." *Berry*, 292 Kan. 493, Syl. ¶ 6; see also *State v. Mireles*, 297 Kan. 339, 365, 301 P.3d 677 (2013), (instruction on lesser included offense must be "factually appropriate"). All of the evidence before Wells' jury was about intentional conduct. Either Wells intentionally abused B.C., or she intentionally tried to save her life and failed. Lesser, reckless crimes were never in issue. *State v. Plummer*, 295 Kan. 156, 208, 283 P.3d 202 (2012).

*Parole*

Wells argues, and the State concedes, that her sentence should reflect that she is ultimately to be evaluated for lifetime parole rather than released to lifetime postrelease supervision. The lifetime postrelease portion of Wells' sentence is illegal, see *State v. Seward*, 296 Kan. 979, 297 P.3d 272 (2013); *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011); and it may be corrected at any time. See K.S.A. 22-3504; *State v. Gilliland*, 294 Kan. 519, 552, 275 P.3d 165 (2012). We therefore vacate the postrelease portion of her sentence. See *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (postrelease vacated in similar circumstances).

CONCLUSION

Having rejected each of defendant Melissa Wells' claims of error of conviction, we affirm her convictions of felony murder and abuse of a child. We vacate that portion of her sentence dealing with lifetime postrelease.

\* \* \*

MORITZ, J., concurring: I concur with the majority's analysis of the issues regarding the limiting instruction, substitute counsel,

alternative means, the exclusion of evidence, and sentencing, as well as the decision to affirm Wells' convictions. I disagree, however, with the majority's conclusion that the prosecutor did not commit misconduct in commenting on the credibility of the defendant's expert in closing argument. Further, I disagree with the majority's rationale for concluding that there was no evidence upon which to base lesser included instructions of reckless second-degree murder and reckless involuntary manslaughter because I would find that rationale inconsistent with another recent decision from this court. Finally, I take the opportunity to reiterate my agreement with the view that even when there is some evidence to support a conviction for a reckless crime, that evidence nevertheless may be insufficient to "reasonably justify" a conviction for the lesser crime under K.S.A. 22-3414(3). I would find that to be the circumstance here, and for that reason, I would hold the trial judge was not required to *sua sponte* give the lesser included instructions in this case.

*Prosecutorial misconduct*

The majority concludes the prosecutor did not commit misconduct in closing argument by commenting on the credibility of Wells' expert witness, Dr. Young. The majority succinctly summarizes the prosecutor's comments but the full context of closing argument provides important context. During the first portion of her argument, the prosecutor stated,

"And then you have the gold standard guy. Interesting that he [Dr. Young] used that term the day after Dr. Groves. Hired by the defense, $300 an hour. He comes in, not just to give a second opinion, but to say that Dr. Gillis, Dr. Han, Dr. Christensen, Dr. Groves, Dr. Lowen, and Dr. Mitchell are all wrong; six doctors. They weren't wrong; the word he used was 'they're mistaken.' They're mistaken because I didn't see any retraction balls. You've got to have retraction balls in a shaken baby case. Not true. Not true because Dr. Lowen told you, You're not always going to have them. Dr. Mitchell said, You're not always going to have them. There is no checklist for injuries in a shaken baby case. Abusive head trauma, you don't have—I've got to have one through ten to know that that's what it is. You might have a couple of them, you might have all of them. It depends on the case.

"Then you have the slides that they showed. Now Dr. Young says, Well, okay, that might be a retraction ball. Okay. Well, do we not have them, or do we have them?

"You know, you decide ladies and gentlemen. You get to determine the credibility of a witness. You get to decide what motivations they have . . . —why they're testifying the way they are.

"You know, Dr. Young expects the checklist to be there, and all these other doctors are just mistaken. But you still got all the other folks, the shifting stories, the fact that Dr. Young apparently didn't know the Defendant had ever admitted that she had shaken [B.C.]. Might be something he would need to know for his opinion. He discounts all of the inconvenient facts of the case. And what does he rely on? Her version, and her version alone, because it's inconvenient to his opinion to consider what else is out there."

Importantly, in this first portion of closing argument, the prosecutor did not stray from the evidence. But in the second portion of her closing, the prosecutor, responding to defense counsel's closing remarks, said:

"[Defense counsel] asks—he puts this query to you: Why is [Dr. Young] saying this is a non-accidental death? Folks, are there at least $3,500 worth of reasons of why he is saying that for his client?"

The majority relies on *State v. Jones*, 273 Kan. 756, 47 P.3d 783, *cert. denied* 537 U.S. 980 (2002), in finding the prosecutor did not commit misconduct when she asked the jury whether there were "at least $3,500 worth of reasons" for Dr. Young's testimony. I acknowledge that *Jones* held that prosecutors are permitted through cross-examination to expose witness bias or motive and, accordingly, are allowed to comment on such evidence during closing argument. 273 Kan. at 783.

But the majority cites *Jones'* holding without examining *Jones'* application of that holding. I would revisit *Jones* here, as I believe it permitted the prosecutor to go beyond commenting on evidence, and in that sense, its ultimate holding is fundamentally flawed.

In *Jones*, the prosecutor argued in reference to a paid defense witness,

" '[W]hat we have is somebody that comes into a case that gets paid up to $120,000 a year to come in and criticize people that do [DNA analysis]. You can test his credibility by that, *just like you test [E.G.] and [S.W.'s] credibility because they get paid to provide [sexual] services*. Right? The only difference being [S.W.] and [E.G.] trade their services for crack cocaine.' " (Emphasis added.) 273 Kan. at 783.

The defendant in *Jones* argued the prosecutor improperly compared the motivation of defendant's expert witness to the motivation of "crack prostitutes," who also had testified in the case. But this court disagreed, reasoning the prosecutor based his comments on evidence presented at trial, and concluded that "[t]he prosecutor was making the point for the jury that Dr. Stetler is paid for his testimony and that this arrangement may influence what he had to say." 273 Kan. at 783.

I find *Jones'* application of its own holding flawed because the prosecutor in *Jones* went beyond simply commenting on facts in evidence. Instead, the prosecutor impermissibly drew a conclusion for the jury regarding the expert witness' credibility by suggesting that the jury should view the credibility of the defendant's expert, who was paid for his services, just as it viewed the credibility of a crack prostitute.

Ultimately, I would uphold *Jones'* conclusion that prosecutors are permitted through cross-examination to expose witness bias or motive. However, I would modify *Jones* to the extent that it has been broadly applied to permit prosecutors to "comment on such evidence" in closing argument when that comment is, in reality, a not-so-thinly disguised comment on the witness' credibility.

Similarly, in this case I would find that the prosecutor appropriately cross-examined the defense expert, Dr. Young, regarding any possible basis for bias and motive, including payment for his services. Thus, in closing argument, the prosecutor could have contrasted Young's testimony with that of the State's experts and could have invited the jury to consider Young's potential motivation, including evidence of payment, along with any other evidence of motive or bias, in assessing Young's credibility. But the prosecutor went beyond commenting on the evidence and took on the role of the jury in assessing credibility when she queried, "Why is [Dr. Young] saying this is a non-accidental death? Folks, are there at least $3,500 worth of reasons of why he is saying that for his client?"

Further, I would find the prosecutor's use of a thinly veiled euphemism for the term "liar" to be inconsistent with this court's explicit rejection of that practice in prior cases. See *State v. Elnicki,* 279 Kan. 47, 62-64, 105 P.3d 1222 (2005) (finding prosecutor's use

of several variations of the term "liar" improper); *State v. Finley,* 273 Kan. 237, 247, 42 P.3d 723 (2002) (acknowledging that this court's decision in *State v. Pabst,* 268 Kan. 501, 996 P.2d 321 [2000], "inform[ed] us the use of the word 'lie' or its derivatives should be avoided by prosecutors"). By condoning the prosecutor's comment here, the majority not only invites prosecutors to continue to "tread very close to the error line," it encourages prosecutors to smudge—or even erase—a line that already appears to be scrawled crookedly in chalk. Nevertheless, although I would find misconduct, I would ultimately conclude based on the weight of the evidence that the prosecutor's misconduct was harmless.

*Unrequested Instructions on Lesser Included Offenses*

Second, while I agree that Wells was not entitled to unrequested instructions on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter, I would reach that result for a different reason.

Applying the *Williams'* framework, I agree that the omitted instructions were neither legally nor factually appropriate. See *State v. Williams,* 295 Kan. 506, 515-16, 286 P.3d 195 (2012). As the majority points out, the relevant inquiry on this last point is whether there was " 'some evidence reasonably justifying a conviction of some lesser included crime beyond a reasonable doubt.' " 297 Kan. at 749 (quoting *State v. Berry,* 292 Kan. 493, Syl. ¶ 6, 254 P.3d 1276 [2011]; *State v. Mireles,* 297 Kan. 339, 365, 301 P.3d 677 [2013].

But I find the majority's conclusion as to this issue difficult to reconcile with its conclusion in *State v. Cheffen,* 297 Kan. 689, 303 P.3d 1261 (2013). Like Wells, the defendant in *Cheffen* was convicted of felony murder and the underlying felony of child abuse. Like Wells, *Cheffen* argued on appeal that the trial court erred in failing to give an unrequested lesser included offense instruction. Applying the same clear-error analysis as the majority applies here, the majority in *Cheffen* concluded the trial court erred when it failed to *sua sponte* give an instruction on second-degree intentional murder because the defendant's acts and the circumstances of the child abuse were such that the jury could have reasonably

inferred that the defendant intended to kill the child victim. 297 Kan. at 704.

Yet, in this case, the majority concludes that "[a]ll of the evidence before Wells' jury was about intentional conduct. Either Wells intentionally abused B.C., or she intentionally tried to save her life and failed. Lesser, reckless crimes were never in issue." 297 Kan. at 762. Thus, the majority finds there simply was no evidence to support the lesser instructions. I disagree.

The State presented evidence at trial that Wells shook B.C. "pretty hard," that Wells allowed K.W. to bounce or jump on B.C. and hit her with a doll, and that Wells hit B.C.'s head against an entertainment center while carrying B.C. out to meet the ambulance. As the majority points out, this is evidence of intentional conduct. But the fact that this evidence supports a finding of intentional conduct does not preclude a finding that Wells' intentional conduct resulted in the reckless killing of B.C. See, e.g., *State v. Deal*, 293 Kan. 872, 881, 269 P.3d 1282 (2012) (concluding defendant's act of intentionally beating his victim evidenced conscious and unjustifiable disregard of danger to his victim and supported conviction for second-degree reckless murder). Further, the evidence relating to the lesser included instruction here provides as much, if not more, evidence to support a finding of error than the evidence relied upon to find error in *Cheffen*.

In short, if the majority in this case is to be consistent with *Cheffen*, it should conclude that the requested lesser included instructions were factually appropriate here, just as they were in *Cheffen*, but that the error in failing to give the instructions, as in *Cheffen*, was harmless.

I fear that trial judges, asked to determine when a lesser included instruction is required despite the lack of any request for such an instruction, will find the distinction between this case and *Cheffen* nearly impossible to discern. Here, despite some evidence to support the lesser instructions, the majority finds the trial court was *not* required to *sua sponte* give those instructions. But in *Cheffen*, where there was some evidence to support the lesser instruction, the majority concludes the trial judge *was* required to give a lesser included instruction.

That being said, I reiterate my agreement with Justice Rosen's position in *Cheffen* and would similarly conclude here that the unrequested instructions were not factually appropriate—not because there was *no* evidence to support convictions for lesser included crimes of reckless murder—but because the evidence supporting those reckless crimes, like the inferential evidence of intent in *Cheffen*, did not reasonably justify a conviction of some lesser included crime. See *Cheffen*, 297 Kan. at 705-06 (Rosen, J., concurring). As in *Cheffen*, the majority's application of the statutory standard to the facts in this case fails to take into account the second part of the test—*i.e.*, whether the evidence of the lesser included offense could reasonably justify a conviction beyond a reasonable doubt. This is the standard a trial judge—who is viewing the evidence in real time—must apply when considering whether to give a lesser included instruction despite the failure of a party to request it. See K.S.A. 22-3414(3).

In conclusion, I share the concern expressed by the concurrence in *Cheffen* that the majority's approach "establish[es] a standard where in reality a district court judge has no option but to automatically instruct the jury on all lesser included offenses, regardless of whether the instructions are requested and in spite of the actual evidence." *Cheffen*, 297 Kan. at 706 (Rosen, J., concurring). As Justice Rosen aptly remarked in *Cheffen*, this "has never been the law and should not become the law of this state." 297 Kan. at 706 (Rosen, J., concurring). This case and its inconsistency with *Cheffen* demonstrate the hazards of the majority's approach.

ROSEN, J., joins in the concurrence on the issue of lesser included offense instructions.

BILES, J., joins in the concurrence on the issue of prosecutorial misconduct.